### LARSON et al. v. GENERAL MOTORS CORPORATION.
#### No. 131.

Circuit Court of Appeals, Second Circuit.
March 9, 1945.

320

See also, D.C., 52 F.Supp. 286.

Murray M. Cowen, of New York City (Murray M. Cowen and Michael Rechler, both of New York City, of counsel), for Louis Larson and Edward Johnstone, plaintiffs-appellants.

Drury W. Cooper, of New York City (Drury W. Cooper and Drury W. Cooper, Jr., both of New York City, of counsel), for General Motors Corporation, defendant-appellee.

Before L. HAND, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

In this action the plaintiffs seek to recover for use by the defendant of an alleged novel plan originated by them and submitted to the defendant under circumstances indicating that they were to be paid for the use.

The plaintiffs alleged that in the latter part of 1933 they conceived the idea of constructing automobile bodies of the coupe type so as to eliminate the rumble seat and to utilize the unused space immediately behind the driver's seat for the seating of passengers and carrying luggage without the necessity of lengthening the body. It involved the construction of two additional or middle seats which might be constructed solid to the floor behind the front seat or from the side walls of the car and, in the latter case, folding back to the walls, when not in use. Better entrance to the seats would be afforded if the door was made wider than in the present models. On February 8, 1934 Larson, one of the plaintiffs, sent to General Motors a description and drawings of the design of the coupe. On February 20, 1935 the plaintiffs sent a second letter to the defendant enclosing a copy of their patented coupe. In this letter they gave much the same description of the remodelled coupe as in the first, adding that if roomy seats were wanted, a few inches could be added to the length of the roof of the car over the seats, while the body length remained as before.

The specification of the patent, which was granted on December 11, 1934, upon an application filed April 3, 1934, differed from the description in the memoranda accompanying the two letters merely because it did not mention the elimination of the rumble seat but apparently retained a rumble seat as well as added middle seats, did not allude to the lengthening of the top or the widening of the door so as readily to enter the middle seats, and provided no entrance to them except from the rumble seat or over the back of the driver's seat.

The main question before us is whether the defendant adduced substantial evidence that it did not make use of the plaintiffs' design. We hold that it did and, therefore, that the verdict of the jury resolving the issues in defendant's favor was proper. We think there is such evident in the testimony of Golubics, an engineer of the so-called Fleetwood Unit of the Fisher Body Division of General Motors. He was a draftsman of the Fleetwood Unit and testified that a convertible coupe for an 8-cylinder, a 12-cylinder and a 16-cylinder Cadillac was designed and a coupe was constructed at that unit having opera and auxiliary seats, and no rumble, between May and October 1933. Its middle seats were hinged to the side walls and folded back

and its doors were wider than in former coupes so as to give access to the opera seats and the roofs were made longer so as to give more head room. Coupes of this type were illustrated in Exhibits L-1 to L-6 which the photographer Eagle said were prints made from negatives he took in the fall of 1933. They all show coupes with middle seats of the sort the defendant afterwards sold and which plaintiffs claim were based on their invention disclosed to the defendant in the letters of January 8, 1934 and February 20, 1935, heretofore mentioned. Eagle's verification of the photographs was confirmed by contemporaneous records. The type of coupe Golubics said was designed in 1933 was a 1934 model illustrated in Exhibit Q. The witness Fernwood testified that he saw a Cadillac convertible coupe having a rumble seat and two opera seats, hinged either to the side or to the back of the car, at a dealers' show in Detroit in December 1933. The plaintiffs attack all the foregoing testimony and exhibits on various grounds, which need not be detailed but in general are that the dates of the drafts and photographs were not sufficiently verified to be trustworthy. But if these documents did not furnish irresistible proof that the defendant did not develop its coupe from the plaintiffs' design but designed it through the work of its own engineering staff they certainly afforded substantial evidence that plaintiffs' teachings did not contribute to the result and fully justified the verdict of the jury. Plaintiffs' criticisms of the defendant's proof that it designed the type of coupe in 1933 which is shown in Exhibits L-1 to L-6 only go to the weight of the evidence which was a matter solely for the jury. Plaintiffs' argument that the disclosure of their design was prior to the development of defendant's coupe because defendant's advertising did not mention such a coupe as is shown in Exhibits L-1 to L-6 may have been of some weight but how much was a question for the jury.

The court submitted the five questions to the jury. These questions and the special verdict in answer to them were as follows:

"1. Did the plaintiffs prior to defendant's first use of same conceive and develop an original and novel idea or plan for the construction of a four-passenger coupe without rumble seats having for its primary purpose the elimination of the rumble seat and the utilization within the body proper of the unused space located between the operator's seat and the back wall for the seating of two additional passengers and the carrying of luggage without the necessity of lengthening the body, which idea or plan required the lengthening of the roof and the widening of the doors in existing coupes? No.

"2. Did the defendant for the first time after its receipt of Plaintiffs' Exhibits 2-A and 5-A use plaintiffs' ideas as expressed in said exhibits in the construction of its four-passenger coupes built without rumble seats? No.

"3. Do you find as a matter of fact that the defendant, General Motors Corporation, prior to February 8, 1934, devised and made and shipped coupes without rumble seats and containing folding opera or additional seats placed in the space or cabin behind the driver's seat with the doors widened and the roofs lengthened? Yes.

"4. Do you find as a matter of fact that, in 1930, the Derham Body Company. of Rosemont, Pennsylvania, devised, made and shipped coupes without rumble seats and containing folding opera or additional seats placed in the space or cabin behind the driver's seat and with the roofs lengthened and the doors widened? Yes.

"5. Do you find as a matter of fact that patents and publications issued at least as early as 1928 disclosed coupes containing folding opera or additional seats placed in the space behind the driver's seat, with the roofs lengthened and the doors widened? Yes."

On rendition of the foregoing special verdict the court directed judgment for the defendant which thereupon was entered accordingly.

The plaintiffs attack answers to questions 1, 2 and 3 on the ground that they were not warranted by the evidence. We hold that they were sustained by substantial proof. They criticize the answer to question 4 because the Derham Body Company, which was shown to have devised coupes prior to plaintiffs without rumble seats, but with folding or opera seats space behind the driver's seat, was not found by the jury to have made its cars without lengthening the body. They criticize the answer to question 5 because the jury did not find that the car described in the plaintiff's patent differed from the invention disclosed to the defendant in their letters and descriptions of January 8, 1934 and February 20, 1935. But a judgment for the defend-

ant was required by reason of the answers to the first three questions so that the answers to the 4th and 5th are quite irrelevant. The earlier coupe designed by Derham and that disclosed in plaintiffs' patent would not defeat the plaintiffs' claim if they had been the first to call the attention of the defendant to a design which it made use of under circumstances indicating that payment was anticipated. That the plaintiffs made no original disclosure to defendant the verdict of the jury in answer to questions 1, 2 and 3 plainly establishes.

The plaintiffs object to the admission of some of the exhibits and to the exclusion of others, but these exhibits had no bearing on the answers to questions 1, 2 and 3. The refusal of the trial court to admit portions of the deposition of Brun was neither erroneous nor prejudicial. Brun was Supply Manager for the Overseas Operations Division of defendant. He testified that no coupes or roadsters with opera seats were exported by the defendant prior to the year 1935, but said that models were supplied with opera seats during 1934 although none were exported in that year. But as Supply Manager of the Overseas Operations Division he cannot be said to have been an agent of the defendant having such general powers as would make his admissions as to matters outside of his own department binding upon it. For the foregoing reasons we hold that the objections of the plaintiffs based upon the admission and exclusion of various items of evidence cannot affect the judgment for the defendant.

The belated attempt to obtain a reversal because the wife of Juror No. 1 was the holder of ten shares of stock of General Motors deserves little consideration. Assuming that there was a disqualification, which we do not suggest, there was no error in the court's action. In the first place, plaintiffs' attorney did not in terms challenge Juror No. 1, for, when the judge said to him that his request that the juror be excused was not a challenge, he took no further action. But, even if this view be regarded as too technical, the ruling can furnish no ground for reversal, since on the sixth day of the trial the court offered to cure any prejudice to plaintiffs, arising from the presence of Juror No. 1 on the panel, by substituting one of the alternate jurors who had heard all the testimony.

Rule 47(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, which governs the use of alternate Jurors, reads:

"* * * Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties. * * *"

We can see no reason for construing the above clause of Rule 47(b) narrowly and thus burdening the parties and the court with new trials caused by granting motions to withdraw a juror who is found to be incompetent to serve. The words "jurors who * * * become unable or disqualified to perform their duties" certainly cover an ineligibility on the part of a juror that is first discovered after the trial has begun. We think that they also include an incompetence of a juror first held to exist because of a changed ruling by the trial judge during the progress of the trial. But the offer, on the sixth day of the trial, to cure the alleged erroneous ruling was not all. Two days later, when an alternate was substituted because of the absence of Juror No. 10, the court asked plaintiffs' counsel whether he wanted a juror withdrawn and a mistrial declared. After an interminable colloquy from which it is apparent that plaintiffs' counsel wished to go on with the trial and retain the chance of succeeding before the jury, while at the same time preserving his objection to the ruling of the court, he at first consented to have the trial continue (f. 776 Plaintiffs' Appendix) with the substitution of an alternate juror in place of Juror No. 1 and another in the place of Juror No. 10, who was unable to continue as a juror, but later withdrew his consent to the substitution of a juror in place of No. 1 without asking for a discharge of the panel. The following occurred:

"Mr. Cowen: I just want to say that I think it would be more sensible, according to my view of the case, if we just fill the place of juror No. 10 and leave the jury as it is, with one other alternate, so that in the event something should happen to another juror at least we will have another alternate.

"The Court: Will that be agreeable to you?

"Mr. Cooper: Yes, your Honor.

"The Court: That means we simply fill the post of Mrs. Trank. All right, call the jury back.

"(The jury returned to the courtroom.)

"The Court: Mrs. Trank's husband is ill. By consent of the attorneys I am excusing her and substituting one of the alternates." (Record pp. 260, 261.)

The record shows not only various offers to counsel to substitute an alternate for Juror No. 1, which would have cured any prior error in this connection, but also shows a waiver of the objection by plaintiffs' counsel when he failed to answer the judge's question as to whether he wished a mistrial or a substitution of an alternate juror and made no objection to going on with the trial.

The contention of plaintiffs' counsel that they did not have a fair trial is wholly without basis and ought not to have been made. The action of plaintiffs' counsel in insisting on objecting to Juror No. 1, when his grievance could easily have been obviated by the acceptance of an alternate juror, the filing of a groundless affidavit of prejudice (unaccompanied by the affidavit of counsel required by the rule) which he later withdrew, charges against opposing counsel, and charges that the judge himself was partial, though most offensive, were treated by the court with much forebearance. If there was any prejudice to the plaintiffs it was due to the unseemly antics of their counsel.

It is unnecessary to discuss certain other trivial objections taken in the course of the trial which we hold were without merit.

Judgment affirmed.