UNITED STATES of America

v.

Morris C. GOLDBERG, a/k/a Moe Goldberg and M. C. Goldberg.

Cr. No. 20663.

United States District Court
E. D. Pennsylvania.

June 26, 1962.

Drew J. T. O'Keefe, U. S. Atty., James McGirr Kelly, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Thomas D. McBride, Raymond J. Bradley, Philadelphia, Pa., for defendant.

KRAFT, District Judge.

Defendant was tried to a jury and found guilty on eight counts of an indictment charging conspiracy and attempted evasion of income taxes due from defendant personally and from several corporations under defendant's control. His post-trial motions challenge the sufficiency of the indictment and the evidence, and assert various trial and procedural errors.

The facts, though somewhat complicated in the proof, are comparatively simple in the telling. Defendant, at all material times, was president and virtually sole owner of thirteen corporations, engaged for the most part in the laundry and linen supply business. These enterprises included Pennsylvania Coat & Apron Supply Co. (New Jersey); Pennsylvania Laundry Co.; Pennsylvania Coat & Apron Supply Co. (Pennsylvania); and Anderson's Empire Coat, Apron and Towel Supply, Inc.

Throughout 1955 and 1956, defendant was indebted to various of his corporations for money borrowed by him on open account, and those accounts appeared as assets on the respective corporate books under the caption "loan and exchange accounts." The oral and documentary evidence established that defendant caused the records of the four above-named corporations to be rewritten so that the cash sales of those corporations for 1955 or 1956, or for both years, would be understated in very substantial amounts. These reductions in sales were in turn offset by the entry of credits to defendant's loan and exchange account, which, of course, reduced defendant's indebtedness to his corporations.

Count 1 of the indictment charges defendant with conspiring willfully to attempt to evade and defeat taxes due by defendant individually for 1955 and 1956. Counts 2 and 3, respectively, charge attempted evasion of taxes due by defendant individually for 1955 and 1956. Counts 4, 5, 7, 8 and 9, respectively, charge attempted evasion of taxes due by the four above-named corporations, as follows: Pennsylvania Coat & Apron Supply Co. (New Jersey) for the period January 1, 1955, to September 1, 1955; Pennsylvania Laundry Co. for 1955; Pennsylvania Coat & Apron Supply Co. (Pennsylvania) for 1956; Anderson's Empire Coat, Apron & Towel Supply, Inc., for 1955; Anderson's Empire Coat, Apron, & Towel Supply, Inc. for 1956.

Defendant's first complaint is that Count 1 does not sufficiently or properly charge an offense against the United States. Count 1, as already noted, charges a conspiracy willfully to attempt to evade defendant's individual income taxes "for the calendar years 1955 and 1956." Defendant has maintained throughout this case that there cannot be a single conspiracy pertaining to two separate taxable years. We denied defendant's motions to require the Government to elect between the two years, and submitted Count 1 to the jury with instructions that it could find defendant guilty thereon if it found a conspiracy to evade his taxes only for the year 1955, or only for the year 1956, or for both years. After mature consideration, we think this was error.

It is, of course, true as a general proposition that a single conspiracy may have as its purpose the commission of more than one offense. The conspiracy is the crime, and it is but one, however diverse its objects. Frohwerk v. United States, 249 U.S. 204, 210, 39 S.Ct. 249, 63 L.Ed. 561 (1919). However, because of the criminal intent necessary for the substantive offense of attempted tax evasion, we conclude that a single conspiracy em-

bracing two separate taxable years is impossible. That criminal intent has been stated by our Court of Appeals in United States v. Martell, 199 F.2d 670, 672 (3d Cir. 1952):

"The rule concerning the state of mind required for conviction for this offense is discussed in United States v. Murdock, 1933, 290 U.S. 389, 394–396, 54 S.Ct. 223, 78 L.Ed. 381, and Hargrove v. United States, 5 Cir., 1933, 67 F.2d 820, 823, 90 A.L.R. 1276. Willfulness is an essential element of the crime proscribed by § 145(b). It is best defined as a state of mind of the taxpayer wherein he is fully aware of the existence of a tax obligation to the government which he seeks to conceal. A *willful evasion of the tax requires an intentional act or omission* as compared to an accidental or inadvertent one. It also requires a specific wrongful intent to conceal an obligation known to exist, as compared to a genuine misunderstanding of what the law requires or a bona fide belief that certain receipts are not taxable."

Conspiracy to commit such a substantive offense cannot exist without *at least* the degree of criminal intent necessary for the substantive offense itself. Ingram v. United States, 360 U.S. 672, 678, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959). It follows that persons can conspire to evade a tax only if they are fully aware of the existence of a tax obligation to the Government which they seek to conceal. Since income taxes become due and payable on an annual basis, it seems manifest that persons cannot at one and the same time conspire to evade more than one year's taxes.

A willful attempt to evade the tax for one year is a separate offense from a like attempt to evade for another year. United States v. Sullivan, 98 F.2d 79, 80 (2d Cir. 1938). We think the same holds true as respects a conspiracy to commit the substantive offense. Accordingly, defendant's motion in arrest of judgment upon Count 1 will be granted.

Defendant contends that the evidence was insufficient to prove that the offense charged in Counts 8 and 9 occurred within the territorial jurisdiction of this Court. These Counts deal with the attempted evasion of taxes for the years 1955 and 1956, respectively, of Anderson's Empire, a New Jersey corporation, with its place of business in Atlantic City, New Jersey. Each of the Counts lays venue as follows:

"* * * in the Eastern District of Pennsylvania, Morris C. Goldberg * * * did willfully and knowingly attempt to evade and defeat a large part of the taxes due and owing by the corporation to the United States of America * * * by causing to be prepared and causing to be filed with the Director of Internal Revenue for the Internal Revenue Collection District of Camden, at Camden, New Jersey, a false and fraudulent tax return * * *."

Each of these returns was filed in Camden, New Jersey. On that basis, venue would lie in the District of New Jersey. Holbrook v. United States, 216 F.2d 238, 239 (5th Cir. 1954); Kowalsky v. United States, 290 F.2d 161, 163 (5th Cir. 1961). On the other hand, if the returns were prepared in this District, this Court would have jurisdiction. United States v. Gross, 276 F.2d 816, 820 (2d Cir. 1960); Kowalsky v. United States, supra. We think the evidence was sufficient to establish that both of the returns were prepared in this District.

Rudolph Csicsek, one of the Government's principal witnesses, was controller and administrative assistant, exercising supervision over all of defendant's companies, during 1955 and 1956. His office adjoined the defendant's, in the headquarters or "main office" of all the companies, on North 12th Street, Philadelphia. Csicsek testified that, to the best of his recollection, the general ledgers for all 13 of defendant's corporations were kept at the 12th Street office; that all the books and records were under his supervision and control during 1955 and

1956; that "changes" made in the records at defendant's direction were made at the main office.

Mrs. Myers, bookkeeper for Anderson's Empire, Atlantic City, in 1955 and 1956, stated that after she prepared the cash receipts and sales journals, they were sent to the main office in Philadelphia and that was "the last I saw of them."

The tax returns of Anderson's Empire for 1955 and 1956 were prepared by a firm of accountants, one of whose offices was located in Philadelphia. Robert Ferst, a partner in the firm, testified that the returns were prepared from Anderson's books and records.

Venue need not be proved by direct and positive evidence. If, upon the whole evidence, it may reasonably be inferred that the crime was committed where the venue was laid, that is sufficient. United States v. Jones, 174 F.2d 746, 748–749 (7th Cir. 1949). We think the jury could reasonably infer from all the evidence that Anderson's tax returns were prepared in this District. Defendant's motions with respect to Counts 8 and 9, therefore, will be denied.

■ The substance of defendant's next complaint is that the jury was not properly constituted. The facts disclose an unusual situation. The panel of jurors which had been summoned included a Mrs. Ida B. Robinson, a saleslady and No. 85 on the list, and a Mrs. Lottie P. Robinson, a housewife and No. 86 on the list. When the entire panel of jurors convened in the jury assembly room, Mrs. Lottie P. Robinson was excused because of a physical indisposition. However, no immediate record of this was made by the jury clerk, and consequently her number remained in the panel from which the jurors were to be drawn for this trial.

When the jury was selected for this case, the Clerk drew No. 86 from the box and called the name of Mrs. Lottie P. Robinson. Mrs. Ida B. Robinson responded and took her place in the group from which the jury of twelve was ultimately selected.

Mrs. Ida B. Robinson was among the jurors examined on voir dire and was one of the twelve jurors remaining after the Government and the defendant had exercised their respective challenges. The Clerk then assigned these twelve to their proper places in the jury box, and, in doing so, he again announced the name of Mrs. Lottie P. Robinson. Mrs. Ida B. Robinson took the place designated by the Clerk. Four alternate jurors were selected, the jury was sworn and the trial began.

The error was discovered after several days of trial. After due consideration, we denied defendant's motion for a mistrial, and, over defendant's objection, substituted an alternate juror for Mrs. Ida B. Robinson.

We think the Court's action was in accordance with F.R.Cr.P. 24(c), 18 U.S.C., which provides in relevant part:

"The court may direct that not more than 4 jurors in addition to *the regular jury* be called and impanelled to sit as alternate jurors. *Alternate jurors* in the order in which they are called *shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties.* Alternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges, shall take the same oath and shall have the same functions, powers, facilities and privileges as the regular jurors. * * *" (Emphasis added.)

Defendant contends that the reference to "the regular jury" contemplates alternates in addition to a jury of 12 which has been properly selected; that the word "become" in the provision for the replacement of jurors "who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties," compels the conclusion that a regular juror can be replaced only when his disability or disqualification occurs *after* his selection and before his retirement to deliberate,

and not when his disqualification existed at the time of his selection but went undiscovered until after he had been sworn and the trial had commenced. The construction for which defendant contends may be a reasonable one, but the language of the rule is at least equally susceptible of the construction placed upon it by the trial Judge. The latter construction, we think, was in compliance with the direction of F.R.Cr.P. 2:

> "These rules are intended to provide for the just determination of every criminal proceeding. They shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay."

There is a singular dearth of authority on the question. However, in Gillars v. United States, 87 U.S.App.D.C. 16, 182 F.2d 962 (1950), a treason trial, it appeared that when the panel was examined on voir dire, they were asked whether any of them was opposed to the death penalty, and one of the jurors did not respond. After the jury was sworn, but before the opening addresses or the taking of testimony, the juror disclosed that she was opposed to capital punishment. It was held that the trial judge properly excused the juror and substituted an alternate in her place. The Court pointed out that the juror's disclosure of her opposition to capital punishment was the disclosure of a disqualification for which she should have been excused, and further stated (p. 980):

> "This being so it was quite proper for the judge to substitute an alternate juror as provided in the Rule. No reason to the contrary has been suggested by appellant except that the jury had been sworn. But no proceedings had been taken except the selection of the jury and the substitution was timely."

In Larson v. General Motors Corporation, 148 F.2d 319, 322 (2d Cir. 1945), the Court construed the language of Civil Rule 47(b), which, in relevant regard, is identical with that of Criminal Rule 24 (c), and stated:

> "We can see no reason for construing the above clause of Rule 47 (b) narrowly and thus burdening the parties and the court with new trials caused by granting motions to withdraw a juror who is found to be incompetent to serve. The words 'jurors who * * * become unable or disqualified to perform their duties' certainly cover an ineligibility on the part of a juror that is first discovered after the trial has begun."

In any event, the defendant claims no actual prejudice and it is difficult to perceive how the Court's action did prejudice defendant's rights in any degree. The jurors who passed upon his plea were all properly qualified to serve as jurors, had been carefully examined on voir dire and found acceptable. We find no real merit in defendant's contention.

 Defendant urges that the Court erred in its rulings on the admissibility of evidence.

Csicsek testified that late in 1954 or early in 1955, defendant ordered him to rewrite the corporate sales records of Pennsylvania Coat and Apron of New Jersey so as to understate its cash sales by an "average" of $3500 a week and to make corresponding credits to defendant's loan and exchange accounts. Later in 1955, according to Csicsek, defendant stated that the loan accounts should be further reduced, and instructed him to increase the amount of the understatement of Pennsylvania Coat and Apron's cash sales and to rewrite the sales records of Anderson's Empire so as to understate its cash sales. Csicsek stated that he personally rewrote the records for the first two months and then instructed another employe, Ferrari, to do the rewriting, and the latter carried on from there. Ferrari testified at length concerning his part in the rewriting of the records.

Csicsek testified that defendant "advised" him to destroy the original sales records, but that he placed them in a filing cabinet in his office and took them

to his home when he left defendant's employ in 1958. He also took certain other records which, according to his testimony, he had prepared for defendant's use, and which related to and analyzed the status of defendant's loan and exchange accounts. Csicsek later delivered these records to the Government which placed them in evidence. There was extensive testimony from Csicsek and other witnesses concerning these documents.

Ferrari and Dombkiewicz worked under Csicsek's direction in the accounting department of defendant's enterprises. They likewise left defendant's employ in 1958, and also took with them, without authority, certain corporate records which they turned over to revenue agents assigned to the case. The Government introduced these records into evidence, and Dombkiewicz, Ferrari and other witnesses testified at length concerning their contents.

The trial Judge admitted in evidence the records taken by Csicsek, Ferrari and Dombkiewicz over defendant's objection, and later denied defendant's motion to strike the exhibits.

Since there is no evidence whatever that any Government official, State or Federal, had participated in, or had any knowledge of, the taking of these documents, they were clearly admissible under the authority of Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). In that case, McDowell filed a petition seeking the return of documents in the possession of a Government official, alleging that these documents were about to be presented to a grand jury. Certain of McDowell's business associates had taken the documents from his safe and turned them over to Government officials. The evidence established that no Government official had participated in or been connected with the taking of the documents. A majority of the Court held that, since the documents had come into the Government's possession without a violation of McDowell's rights by Governmental authority, the Government could retain them for use as evidence.

The dissenting opinion pointed out that the Court would restore the documents to McDowell if they were still in the possession of those who had taken them, and that the Court had power to control their disposition even though they had passed into the possession of a law officer. Conceding that no provision of the Constitution required their surrender, and that the papers could have been subpoenaed, the opinion writer nevertheless concluded (p. 477, 41 S.Ct. p. 576):

"Still I cannot believe that action of a public official is necessarily lawful, because it does not violate constitutional prohibitions and because the same result might have been attained by other and proper means. At the foundation of our civil liberty lies the principle which denies to government officials an exceptional position before the law and which subjects them to the same rules of conduct that are commands to the citizen. And in the development of our liberty insistence upon procedural regularity has been a large factor. Respect for law will not be advanced by resort, in its enforcement, to means which shock the common man's sense of decency and fair play."

Defendant contends that the principle of the Burdeau dissent was accepted as law in Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). We disagree. In Elkins, tape and wire recordings and a recording machine, *which had been seized by state law enforcement officers as the result of an unlawful search and seizure,* had been admitted in evidence in a Federal criminal trial. No Federal officer had participated in the unlawful search and seizure. A majority of the Court held that evidence so obtained could not be used and set aside the conviction. The Court's ruling condemned lawless *official* action, not *private* wrongdoing, in the procuring of evidence. Briefly stated, the decision in Elkins abolished the so-called "silver platter doctrine" and held that evidence

obtained by *State officers* during a search which, if conducted by Federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a Federal criminal trial, even when there was no participation by Federal officers in the search and seizure. So far as our rather exhaustive research has disclosed, the principle of the Burdeau case remains intact.

Defendant argues that, in any event, the circumstances in which the Government received delivery of the records distinguishes the case from Burdeau. Again, we are compelled to disagree. We shall relate those circumstances with as much brevity as is consistent with perspicuity.

Csicsek was jointly indicted with defendant, and originally pleaded not guilty. Following conversations between Csicsek's counsel and the then United States Attorney, it was agreed, in effect, that if Csicsek changed his plea and thereafter fully cooperated with the Government in its case against Goldberg, whatever that cooperation might encompass, the Government, if asked by the sentencing judge, would state the extent and degree of Csicsek's cooperation and would recommend leniency in the form of absence or suspension of a jail sentence. Csicsek then changed his plea to nolo contendere. Thereafter, he delivered the records to the Government.

The uncontradicted evidence establishes that none of the Government officials connected with the case had any knowledge whatsoever that Csicsek had these records—or, indeed, any records—until he delivered them to the revenue agents. The then United States Attorney testified: "My only insistence time after time was that this be a full disclosure, whatever that embodied, but I had no knowledge about what Mr. Csicsek would say or what he had in his mind or anything about records, documentary evidence or otherwise." He testified that he stated to Csicsek's counsel that, "If * * * we are to say that he is cooper-

ating, then it must be understood that he makes a full disclosure, that he will make himself available for question and answer, and any kind of documentary evidence he might have." As we read his testimony, Csicsek's own counsel did not know of these records until after the change of plea.

In light of the evidence, we disagree with defendant's contention that, by its actions, "the government both condoned Csicsek's methods and adopted those methods for its own benefit." The legal and moral implications of the Government's actions here, so far as we can discern, are no different than in Burdeau, supra. In both cases it was merely the unwitting beneficiary of a third person's wrongful acts; and in this case, to a large extent, the unwitting beneficiary of the acts of defendant's own confederate.

In the case of Ferrari and Dombkiewicz, the uncontradicted evidence discloses that they took the corporate records prior to any communication with Government officials. They delivered the documents to the Intelligence Division of the Internal Revenue Service on August 5, 1958. The officer who received delivery testified that "right before they left the office," Dombkiewicz inquired concerning rewards for information given in such situations, and that after some discussion both men signed "Claims for Reward" forms. Ferrari and Dombkiewicz were accountants, and admittedly knew before they took the records that informers were entitled under the law to a fee based upon the amount recovered from the taxpayer upon whom they informed. Defendant argues from this that the Government is not only a receiver of the documents "stolen" by these men, "but it is also in the position of holding out to them the hope of a reward for delivering that which these men illegally obtained." If the defendant means by this that the Government is thereby rendered a participant in the original taking, so as to exclude the documents as evidence, we emphatically disagree. The Government is not bound at its peril

to know that the offer of a reward for information will induce a violation of the law.

We hold, therefore, that the documents which Csicsek, Ferrari and Dombkiewicz delivered to the Government were properly admitted under Burdeau v. McDowell, supra. It follows that the summaries and computations prepared by the revenue agents, and the testimony relating to them, based on the documents, were likewise properly admitted.

■ Defendant alleges error in the charge, and in the refusal to charge as requested, concerning defendant's Exhibit 7, which was among the documents which Csicsek turned over to the Government officers following his change of plea. This paper, so far as here material, contained pencil notations in Csicsek's handwriting, purportedly relating to the closing inventories for 1955 and 1956 of Pennsylvania Laundry, Anderson's Empire and Keystone Coat and Apron. The amounts shown were substantially less than the actual closing inventories stated in the tax returns filed by the respective corporations, and the difference might equal the total amount by which the sales were understated. Revenue Agent Raines noted during his investigation of the case that the inventories "may have been inflated by same amount that sales were knocked down."

We denied defendant's request to charge that, since the Government had the burden of investigating the truth or falsity of these closing inventories, the jury might conclude that what the exhibit showed with respect to actual closing inventories was in fact the actual closing inventories, without proof of its correctness by defendant. Defendant relies entirely on Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), a tax evasion prosecution in which the Government based its case on the net worth method of proof. The Court held in relevant part (135–136, 75 S.Ct. 135):

"When the Government rests its case solely on the approximations and circumstantial inferences of a net worth computation, the cogency of its proof depends upon its effective negation of reasonable explanations by the taxpayer inconsistent with guilt. Such refutation might fail when the Government does not track down relevant leads furnished by the taxpayer—leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence. When the Government fails to show an investigation into the validity of such leads, the trial judge may consider them as true and the Government's case insufficient to go to the jury."

We think the Holland rule is inapposite here. The inventory figures on the tax returns were the corporate taxpayer's own figures,—not the Government's. It seems a curious inversion of logic, to say the least, for the defendant to produce an entirely different set of figures, compiled by the corporations' own accountant, and then to attempt to thrust on the Government the duty of determining which figures are correct. Moreover, Exhibit 7 "explains" nothing. It certainly does not explain the deliberate and systematic rewriting of corporate records to understate sales in substantial amounts and to show corresponding credits to defendant's loan accounts. As we stated in the charge, the origin and purpose of the exhibit is something of a mystery. It came into the case during Csicsek's cross-examination. Yet counsel made no attempt to question him about it. Csicsek's physical condition made it impossible for the Government to call him in rebuttal.

Apart from other considerations, Anderson's Empire, according to Raines' testimony, did not take inventories into account in computing income.

Finally, the evidence establishes that the Government made every reasonable effort to check into the inventory situation. Raines testified: "At the repeated requests by me for inventory information I gave up and I had to accept the

figures that were shown on the returns as being the correct inventory figures." Agent Tiberino testified that, "Mr. Ferst stated that physical inventories were taken and as far as he was concerned they were fairly stated."

We think the instructions to the jury gave defendant all he was entitled to, and possibly more:

"I read and affirm defendant's point 8.

"If you conclude that defendant's Exhibit 7 correctly states the actual closing inventories and that as a result the expenses of Pennsylvania Coat & Apron Supply Company of New Jersey for 1955, of Pennsylvania Coat & Apron Supply Company of Pennsylvania for 1956, of Pennsylvania Laundry Company for 1955, and of Anderson's Empire Coat, Apron & Towel Supply Inc., for 1955 and 1956 were understated to an amount equal to any understatement of sales there would be no taxable income. In that event you must find the defendant not guilty on counts 4, 5, 7, 8 and 9 of the indictment.

"Now, that said, if you conclude that the Defendant's Exhibit 7 correctly states the closing inventories and that as a result the expenses for the companies were understated in an amount equal to the understatement of sales.

"Much has been said about Defendant's Exhibit 7. I am leaving to you, because I cannot remember every jot, tittle of the evidence— you have 12 minds which may be 12 or maybe 24 times as much mental capacity as I have, but you are to review the evidence and determine whether Defendant's Exhibit 7 does correctly state actual closing inventories.

"I say to you my only recollection, and you are to follow your recollection and not mine, is that Exhibit D-7 was established to be in Csicsek's handwriting. I recall nothing more about it and nothing less. I recall no evidence of when it was prepared, from what it was prepared, how it was prepared, why it was prepared, or whether what it purports to state is wholly true, wholly false, or partly true and partly false. You will have to review the evidence carefully and make your own determination from your recollection of the evidence whether or not Exhibit D-7 is shown by the evidence correctly to state the actual closing inventories of those companies for those dates. If you find that they do correctly state actual closing inventories, and you so find from the evidence, and if you find that as a result of that the expenses of those companies for the years I have mentioned were understated to an amount equal to any understatement of sales, then there would be no taxable income and the defendant would have to be acquitted on Counts 4, 5, 7, 8 and 9."

We conclude that defendant's complaints as to the Court's action in respect to his exhibit 7 are altogether wanting in merit.

 Defendant's next contention is that the evidence was not sufficient to support the verdict. His argument on this aspect of the case is somewhat difficult to follow, and seems to fly in the face of admitted facts.

The evidence shows that defendant's so-called loan and exchange accounts in his various corporations were what might be called "running" accounts, and fairly active. Defendant frequently withdrew corporate funds for his personal use and such withdrawals were charged to his various loan accounts. These accounts were, of course, corporate assets, and neither defendant, his accountants nor anyone else concerned ever regarded them as anything else. The evidence discloses that at the beginning of 1955 the debit balances in defendant's loan accounts totalled in excess of $387,000. Throughout 1955 and 1956,

defendant continued to withdraw corporate funds for personal use, and such withdrawals were duly charged to his loan accounts.

The Government's theory of the case was that the credits to defendant's loan accounts in 1955 and 1956—which offset the reductions in income from cash sales —were income to defendant individually in those years, since his indebtedness to his corporations was thereby diminished. That is the basis for Counts 2 and 3. Defendant now makes the surprising assertion that his admitted borrowings from his corporations were not borrowings at all, but were *income*. He now reasons that since there was never any corporate action authorizing the withdrawals, and since he paid no interest thereon and executed no instruments as evidence of his indebtedness, he must have realized income when the money was withdrawn, if, indeed, he realized *any* income. In consequence, he says, the verdict on Counts 2 and 3 cannot stand, since the case was not submitted to the jury on the theory that defendant's withdrawals of corporate funds constituted income. Defendant's contention seems strangely inconsistent with his own sworn testimony on direct examination:

"Q Mr. Goldberg, there has been frequent reference here to what has been described as your Loans and Exchange Account. I want to ask you about that. Did you from time to time borrow money from the corporations?

"A Yes, sir.

"Q For what purpose or purposes?

"A For many different purposes, many different reasons.

"Q Yes; how were those advances to be handled on the books?

"A As far as I am concerned, any monies that were advanced to me were charged to me and I was responsible for the repayment of them, and I insisted that at any time I would ever get any monies

that they shall be charged to my account, and I understand they were.

"Q Were any of those sums used for purely personal matters?

"A Yes, sir.

\* \* \* \* \* \*

"Q Have you used some of the money for business reasons connected with the corporations?

"A Yes, sir.

"Q But in any event, whether it was used for business or for routes or personal expenses, was it your direction that it be charged to your personal account?

"A Yes, sir.

"Q Have you any knowledge of a single penny that was so used that was not charged to your personal account?

"A I do not know of one single penny in that respect.

"Q Now, whose job was it to keep account of the loan account?

"A Mr. Csicsek and his assistants, but as far as I am concerned, Mr. Csicsek is the man who was responsible.

"Q Now, did you from time to time make repayments either in cash or in turning over to the corporation—

"A Yes, sir.

"Q —business purchased, and so forth?

"A Yes, sir.

"Q Whose job was it to give you credit for any credit that you were entitled to?

"A Well, I presume that it was Mr. Csicsek's job to see that things were allocated properly, particularly my personal account, Loans and Exchanges. Everything is to be properly allocated on the books and since he was head man there he is responsible to me for all these things.

"Q Do you have any knowledge of any credit ever having been giv-

en to you to which you were not entitled?

"A No, sir.

"Q Did you ever receive any statement or memorandum from Mr. Csicsek concerning the status of your Loans and Exchange Account at any time?

"A From—like a six-month period when we would get the order I maybe would have an inkling of what it was about."

Citations from defendant's own testimony to the same effect might be multiplied. For example, he made strenuous efforts to borrow money from a Philadelphia bank to pay off his indebtedness on his loan accounts in order to clear the way for a long-term loan from an insurance company. Certainly, if defendant's withdrawals of corporate funds constituted borrowings, they were not income.

In the light of the admitted facts, it is pointless for defendant to argue that, since there was no corporate authority for *either* the withdrawals or the credits, the evidence shows that what defendant did constituted embezzlement. We are not called upon here to adjudicate legal issues between defendant and his corporate creatures. Moreover, defendant could not embezzle funds from his wholly owned corporations. United States v. Augustine, 188 F.2d 359 (3rd Cir. 1951); Davis v. United States, 226 F.2d 331 (6th Cir. 1955); Kann v. Commissioner of Internal Revenue, 210 F.2d 247 (3d Cir. 1953).

Defendant contends that the verdicts on Counts 4, 5, 7, 8 and 9 cannot stand because of the Government's failure to investigate defendant's Exhibit 7,—relying on Holland, supra. We have concluded earlier that Holland has no application in the circumstances of the case at bar, and can add nothing to what has been said on the point.

Our review of the evidence persuades us that it amply supports the verdicts on Counts 2, 3, 4, 5, 7, 8 and 9. Our disposition of Count 1, supra, makes it unnecessary, of course, to consider the evidence with relation thereto.

Defendant's next point is that the verdicts on Counts 2 and 3, and on Counts 4, 5, 7, 8 and 9, are repugnant to one another and cannot stand together. He says that "the money coming from the suppressed sales" of the corporations was income either to those corporations or to defendant, but that it could not be income to both. His argument is, in effect, that if defendant and his corporations are one in the sense that he cannot embezzle corporate funds, then they must likewise be one in respect of corporate income credited to defendant's account on the corporate books; that the Government "may not have it both ways." Defendant overlooks the well-established principle that a corporation and the aggregate of individuals constituting it may be one, or separate entities, as the case may be, for one purpose and not for another. The general rule in all jurisdictions seems to be as stated in Tucker v. Binenstock, 310 Pa. 254, 263, 165 A. 247, 250 (1933):

"The fiction of a corporation as an entity distinct from the aggregate of individuals comprising it was designed to serve convenience and justice. There is consequently an exception recognized wherever the rule is known, namely, that the fiction will be disregarded and the individuals and corporation considered as identical whenever justice or public policy demand it and when the rights of innocent parties are not prejudiced thereby nor the theory of corporate entity made useless."

It has been the law until very recently [1] that embezzled money does not constitute taxable income to the embezzler Commissioner v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752 (1946). Courts have held consistently that one

---

1. James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), expressly overruling Wilcox, has, of course, no bearing here.

cannot embezzle funds from his wholly owned corporation,—probably for the reason that if a regularly-declared dividend is taxable income, informal withdrawals or diversions of corporate income should also be taxable income. Such holding may involve a disregard of the theory of separate entities. As our Court of Appeals stated in Kann v. Commissioner, supra, 3 Cir., 210 F.2d 247, 251:

> "Indeed, under the Pennsylvania and Ohio codes, supra Note 6, and bearing in mind the principles of corporate entity, it would seem to be possible for the proprietor of a one-man corporation to be guilty of embezzlement if he diverted corporate monies to his own pocket without the formality of declaring dividends. Such local law concept of embezzlement, while it may be useful to deter those in control of a corporation from defrauding creditors and minority stockholders, should not, in our opinion, be used as a vehicle for tax avoidance, absent a clear mandate to the contrary."

It follows that there is nothing inconsistent in the Government's position. It is merely asserting settled principles of law based on justice and public policy.

In the course of his oral argument, defendant's learned counsel stated: "Now, I concede that if a corporation gets money and has it and then the officer gets payment improperly, there may arise some question as to whether or not the company doesn't have to account for that and Goldberg has to account for it." The situation disclosed by the evidence here is no different in effect than the case supposed by counsel. However, instead of withdrawing cash and then paying it back to the corporation to be credited to his loan account, defendant shortened the operation by taking the credit directly.

We find no inconsistency or repugnancy in the verdicts on the Counts in question.

Defendant's final contention is that the trial Judge erred in refusing to charge as to the taxability of corporate distributions, as requested.

In defining gross income, we read to the jury a portion of § 61 of the Internal Revenue Code of 1954, 26 U.S.C. § 61, which, of course, lists dividends among many items of income. Defendant's counsel submitted no point on the subject, but stated at the close of the charge that we "did not go into the limitation upon dividends with respect to the earnings and profits available therefor, which is also contained in the Internal Revenue Code." We instructed the jury to disregard what we had said concerning the inclusion of dividends in gross income. This did not meet counsel's suggestion for he then stated that, since part of the Government's theory must be that there was a corporate distribution in the nature of a dividend received by defendant, the jury must be instructed with respect to "the limitations in the Code dealing with the funds."

Counsel misunderstood the Government's theory of the case. It was the Government's contention that defendant received income by reason of the discharge of his indebtedness to his corporations. We pointed out to counsel that when we read to the jury the portion of § 61, we were attempting merely to define generally what was meant by gross income. We granted defendant an exception to our refusal further to charge on the subject of dividends.

Counsel now contends that if the credits received by defendant did not constitute "embezzlement," then they had to be corporate distributions to him; and that under § 316(a) of the Code, 26 U.S.C. § 316(a), "a corporate distribution may be taxed as a dividend only if made out of accumulated earnings and profits or earnings and profits of the taxable year in question." He argues that the question should have been submitted to the jury with appropriate instructions. A very similar argument was advanced in the analogous case of Davis v. United

States, 6 Cir., 226 F.2d 331 (1955). The Court's answer is conclusive here (334–335):

"Appellant contends in this case that, whether the cash which he took from his wholly owned corporation was a 'taxable gain,' depends upon whether the corporation had sufficient surplus to cover a dividend distribution, as otherwise there would be no way in which he could receive such cash as a gain taxable to him and, since there is no proof of such a surplus, he is only a holder of the cash for the benefit of the corporation. However, it does not make any difference whether he received it as a legal distribution of cash as the result of a dividend, or whether he took it fraudulently, using his wholly owned corporation with its false bookkeeping methods and concealment of sales and receipts to hide the fact that he was secretly acquiring from this source the cash, over which he exercised command, control, and dominion, and from which he realized economic gain and benefit. For 'taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid.' Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916."

We think, under the evidence, that the only issue properly before the jury on this facet of the case was whether defendant received income by reason of the discharges of his indebtedness to the several corporations by the application to his "loans and exchange accounts" of the credits entered there in amounts offsetting the differences between the actual cash sales income and the cash sales income as understated in the rewritten books.

### Order

Now, June 26th, 1962, it is ordered and decreed that:

1. Defendant's motion in arrest of judgment as to Count 1 of the indictment is granted, and judgment on that Count is arrested.

2. Defendant's motions as to Counts 2, 3, 4, 5, 7, 8 and 9 of the indictment are denied.

3. Defendant is ordered to appear for sentence on July 10th, 1962, at 11 A.M.