**O'ROURKE v. RKO RADIO PICTURES, Inc.**

No. 43.

District Court, D. Massachusetts.
March 4, 1942.

See, also, 27 F.Supp. 996.

James M. Hoy, Edward B. Hanify, and Ropes, Gray, Best, Coolidge & Rugg, all of Boston, Mass., for plaintiff.

E. Curtiss Mower, Jr., Jacob J. Kaplan, and Nutter, McClennen & Fish, all of Boston, Mass., for defendant.

SWEENEY, District Judge.

In this action, which was begun by a bill in equity in the state court, the plaintiff seeks damages and an accounting of the profits derived from the production and exhibition of defendant's motion picture "Condemned Women". The plaintiff alleges that the story of that picture was unlawfully copied and appropriated in whole or in a substantial part from a story "Girls' Reformatory" which he had written and submitted to the defendant for purchase. The defendant denies that any part of "Condemned Women" was taken from "Girls' Reformatory", and, while admitting access to the script of "Girls' Reformatory", says that the story upon which "Condemned Women" was based was purchased from one Lionel Houser many months before the plaintiff's story was submitted to it or even fully written.

### Findings of Fact.

Both stories deal with the life of an inmate of a women's prison. There are many similarities between the two stories which naturally follow from their locale and from the necessity of weaving into such a story certain basic ingredients, such as love interest, the discipline of prison life, a prison riot and fire, and the pathos incidental to the confinement of women in prison. It is in the treatment of these ingredients that

the plaintiff alleges the defendant has stolen from his story.

The plaintiff's story opens with its heroine Joan Blake in prison. She has killed a man while defending herself from attack in a nightclub. A former nurse, she is assigned to help the prison physician. They fall in love with each other. A flood in a nearby town gives Joan the opportunity of assisting the prison doctor who is called to the flood area, and she does meritorious work there. The doctor proposes marriage to her, and, after counselling against it, she agrees to marry him. Joan is paroled, presumably for the fine work she has done in the flood area. She marries the doctor, and they settle down to live in a nearby town where the doctor has a private practice. As an ex-convict, she is not received socially by the women of the town. On the contrary, they combine to make her and the doctor's life disagreeable and difficult. Joan watches her husband's great efforts and views with apprehension the resulting loss in his business, and, knowing it is because of her past that he is unsuccessful, she runs away to a distant city. In doing this, she violates her parole. In the distant city she is picked up by police officers, and returned to the prison to complete the balance of her original sentence. The doctor, in the meantime, has been distracted by her absence, and has started drinking heavily. His attempts to locate her are not successful. In a drunken fit the husband strikes another doctor with a bottle, and, assuming that he is dead, runs away. While hiding in a cabin in the mountains, he hears an automobile wreck, and, rescuing the occupants of the car, he learns that one is the Governor of the state. From him he learns that the doctor whom he had hit is not dead and has made no complaint against him.

During a prison riot in which Joan takes no part she is killed protecting a child from the rioters. Her husband, the doctor, reaches the prison with the Governor just in time to hold her in his arms before she dies.

The theme of the story deals with the futility and the impossibility of regeneration of a woman who has a prison past, and attempts to portray that society in general is cruel in that it will never overlook the mistakes of a woman.

The story "World of Women" was purchased from one Lionel Houser by the defendant early in 1937, and made into defendant's picture "Condemned Women". The first draft continuity depicts the heroine Linda being transported by ferry to a prison to which she has been committed for a series of minor crimes. Dejected, she attempts suicide, but is prevented in this by a fellow passenger who turns out to be a doctor who is being assigned to the prison to which she has been committed. The doctor is a friend of the warden, and Linda is assigned to work with him when it is discovered that she has had previous nursing experience. Linda refuses to join a group in a contemplated prison break. Narcotics are stolen from the hospital to which Linda alone apparently has access, and, on a search being made, the narcotics are found amongst Linda's effects. She is placed in solitary confinement, but about this time a typhoid epidemic breaks out in prison, and she is released to do service in the hospital. After the epidemic is controlled, she and the doctor have many moments together when they pour out their love for each other.

When the warden reprimands the head nurse for neglect of duty, she discloses to the warden that the doctor and Linda are in love with each other. He talks with Linda about it, and convinces her that her love is futile and can bring only tragedy to herself and the doctor. She eventually realizes that marriage to the doctor will result in wrecking his life, and, to avoid this, she makes up her mind to convince the doctor that she no longer loves him. She joins a group of fellow convicts who are about to make a break from the prison. She steals the keys, and, together with other prisoners, makes the attempt to escape. In making the break, they chop a hole in a smoke conveyor, allowing the smoke to escape inside the building. This terrifies the other prisoners who, thinking the prison is on fire, become excited and panicky. In the resultant confusion and rioting Linda and her pals try to break out. They kidnap the head matron, and, using her as a shield, drive through the prison gates in her car. They dump the matron from the car after getting out on the public highway, and Linda and another convict continue the flight. The other convict, who had received a bullet wound during the riot, dies in the car. Linda successfully eludes capture for a while. Meanwhile, the doctor, not knowing that the warden had convinced Linda of the futility of their marriage, is perplexed as to the cause of her escape.

At liberty, she is drawn to an advertised medical convention where the doctor is scheduled as the principal speaker. On going to this convention hall, she discovers that the advertisement is a plant when she is picked up by detectives and returned to prison to complete her sentence. There, in the warden's office she parts forever from the doctor and marches resolutely to complete her sentence.

In a later revision of the story, there is a subsequent trial of Linda for escaping from prison. Many of the inmates and jail officials falsely testify against her as the ringleader of the break. At the last moment the doctor intercedes with the court, and puts the warden on the stand, drawing from him the admission that he was the cause of Linda's changed conduct and her participation in the prison break by reason of the fact that he had warned Linda against marrying the doctor. Linda is exonerated from leadership in the prison break, and is sentenced merely to finish out the balance of her parole sentence. She and the doctor are reconciled, and she returns to prison to finish her sentence as the story ends. This revision has no similarity to any depicted situation in the plaintiff's story, and must be accepted as a "run of the mill" change.

■ A careful study of the two stories does not show such a similarity between them as might not be the result of coincidence, particularly in view of the very limited field of situations which are available to authors writing stories based on life in a women's prison. The real cause for inquiry as to possible plagiarism is the fact that the defendant, at some time prior to the final production of its picture "Condemned Women", admittedly had access to the plaintiff's manuscript. Courts have suggested that where access is proved or admitted, there is a presumption that any similarity is not accidental. I do not go so far as to adopt the presumption theory, but in the face of a showing of access strong proof from the defendant is required that its material came from an independent source. As stated in Shipman v. R. K. O. Radio Pictures, 2 Cir., 100 F.2d 533, 538, "with access admitted, similarity of incident rests upon a high degree of probability of copying and a low degree of probability of independent creation." As access is admitted, we must carefully examine the proof offered by the defendant that its story came from an independent source. And, in making this examination, we must have in mind that it is well settled that it is not necessary to exactly duplicate another's literary work in order to be liable for plagiarism, it being sufficient if an unfair use of such work is made by the lifting of a substantial portion of it. Shipman v. R. K. O. Radio Pictures, supra. On the other hand, even an exact counterpart of another's work does not constitute plagiarism, providing that such counterpart was arrived at independently and without in fact resorting to the other's work. Fred Fisher, Inc., v. Dillingham, D. C., 298 F. 145, 147.

■ The defendant has introduced voluminous evidence to support its claim of independent creation. It offers proof that the first draft continuity of its picture was in its possession in its present form in April, 1937, long before it had access to the plaintiff's manuscript. There is no dispute as to the date of access, which was in October, 1937. The defendant's evidence of independent creation consists principally of company records and story drafts dated between March, 1937, and January, 1938. The date of completion of the first draft continuity is April 12, 1937. The records and story drafts appear to be authentic, and to nullify their effect, the plaintiff must show that they are not true records. This in effect would mean that the plaintiff must show that the defendant fraudulently falsified documents and records in its own behalf. The burden of establishing falsification is clearly on the plaintiff. Though certain unexplained inconsistencies in the records do exist, they are insufficient to prove a charge of falsification.

As an example, one of the bits of evidence urged by the plaintiff to prove the records false is plaintiff's exhibit 12 which is composed of three typewritten sheets calling for changes in the story of "Condemned Women". There is no typewritten date to indicate when these sheets were written, but in the upper left-hand corner of the first sheet appears a pencilled notation "4 C to Sisk 10/19/37". This notation evidently means that on October 19, 1937, someone directed that four copies of the exhibit be sent to Sisk who was the producer. The plaintiff urges that the pencilled date shown on this exhibit is also the date when the exhibit was typed. If this argument is correct the prior continuities are fabrications, for the changes suggested in exhibit 12 had already appeared in the first draft continuity. In other words, if the first

draft continuity was in existence in April, 1937, there would be no necessity on October 19, 1937, to ask for the changes specified in exhibit 12 for the changes had already been made. The difficulty with the plaintiff's argument is this:—the penciled notation appears to be no more than directions to send four copies of the exhibit to Sisk, and that these directions were made on October 19, 1937. On the face of the exhibit there is nothing to indicate that it was made on that date. It well may have been in existence prior to the first draft continuity, and as they approached the production period, which took place in January, 1938, the four copies of this prior prepared exhibit were directed to be sent to the producer so that he might have in mind, in making the picture, points that are emphasized in the exhibit. Either theory is equally plausible. I cannot on the basis of the plaintiff's argument reach a conclusion that the defendant's records prior to October 19, 1937, are complete fabrications. The fact that the records are not letter perfect rather inclines the court to consider them authentic. Records made up to prove a false defense would be more likely than not letter perfect. Beyond the mere existence of these allegedly old records, there is proof of, and I find that the idea of a story about life in a women's prison existed in the mind of Houser as early as 1936, when he corresponded with Liberty Magazine about submitting such a story to that periodical. I find, therefore, that at least the first draft continuity of the defendant's picture was in existence long before it had access to the plaintiff's story. This continuity, except for minor changes which are considered herein, was substantially the story as it appeared in the final picture "Condemned Women".

The plaintiff further alleges that, assuming the existence of the first draft continuity prior to having access to his manuscript, nevertheless, the final picture contained matter which was lifted from his story and did not appear in its first continuity. Some of the changes made in the picture did result in incidents similar to those appearing in the plaintiff's manuscript. But, in view of the similar locale and theme of the respective stories, such similarities would be inevitable. The love affair between the convict and the doctor, the prison riot and fire, the escape, and such, existed in the original conceptions of each author, and were independent of each other. They were more or less stock ideas. But, even if some of the changes in the defendant's story had been suggested by the plaintiff's work, they show at best a use of such a small fraction of the plaintiff's ideas, and a sufficiently different treatment of them, as to fall short of constituting an appropriation of a material or substantial part of the plaintiff's story, which is necessary in order to amount to an infringement of his literary property. Hirsch v. Paramount Pictures, D.C., 17 F.Supp. 816, 818, and cases there cited; compare Nichols v. Universal Pictures Corp., 2 Cir., 45 F.2d 119, 121.

A typical instance of such a change about which there is a specific suggestion contained in the plaintiff's manuscript, and about which there was no mention in the defendant's first draft continuity, was the plaintiff's suggestion that the credit titles should be presented on a background of marching women in prison garb. Considering that it is quite common for moving pictures to contain as a background for their credit titles scenes depicting the main theme of the story on which the particular picture is based, and the fact that the locale of the defendant's picture is almost entirely inside a women's prison, it is conceivable that the defendant arrived at such an appropriate background for the credit titles without recourse to plaintiff's manuscript, and that the incorporation of the plaintiff's suggestion was purely a coincidence. This, too, is a stock idea in which the plaintiff can have no claim to a novel arrangement or a new conception. He has no exclusive property rights in such an idea. Originality in dealing with incidents familiar in life or fiction lies in the association and grouping of these incidents in such a manner that the work under consideration presents a new conception or a novel arrangement of events. 18 C.J.S., Copyright and Literary Property, § 113. A charge of plagiarism is not supported by a mere similarity in ideas, stock or otherwise, unless there appears to have been lifted from one story into another the author's novel association or sequence of these incidents, for in the arrangement, commonly termed the author's "expression", lies the originality.

In the instant case such similarities as exist are in stock ideas or incidents. There is no similarity in the author's treatment of these ideas. Indeed, they are very dissimilar. The plaintiff's story portrays the tragic social consequences of a marriage

between a doctor and a woman ex-convict. The main theme of the defendant's story depicts life in a women's prison with an incidental love story between the prison doctor and a female convict. There is implied in the ending of the defendant's picture the thought that there is no tragic consequence, social or otherwise, to such a love affair. After reading the plaintiff's story and seeing the defendant's picture one does not get the impression that they are substantially the same. On the contrary, one gets the distinct impression that two authors, basing their stories on the same locale, have expressed different themes on the question of social regeneration. The similarities in scenes are but the natural result of the locale.

### Conclusion of Law.

I conclude that the defendant has not used the plaintiff's story as the source from which it drew in whole or in any substantial part for its photoplay. The plaintiff's bill is therefore dismissed.