MEMORANDUM OF DECISION AND ORDER
 

 NEAHER, District Judge.
 

 Plaintiff (“Vantage”), a Texas corporation, commenced this diversity action on September 9, 1977, as against defendant Milton Bradley Company,
 
 [1]
 
 a Massachusetts manufacturer of board games, including a three-dimensional oil exploration game called “King Oil,” the focus of this suit. Briefly stated, plaintiff’s claim is for compensation from Milton Bradley for allegedly using in “King Oil” game ideas plaintiff asserts were drawn from “Wildcat,” an oil exploration game now known as “Oil Tycoon,” which was conceived and developed, and then transferred to Vantage, by its founder and principal shareholder Ronald Potts and by Clinton Word, also a shareholder. The action is now before the Court on defendant Milton Bradley’s motion for summary judgment. For the reasons which follow, the motion is granted.
 

 It is well settled that the party moving for summary judgment has “the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party.”
 
 Adickes v. S. H. Kress & Co.,
 
 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970) (footnote omitted). “The very mission of the summary judgment procedure [however] is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.” Adv.Comm. Note to Proposed Amendments to Rule 56(e), 31 F.R.D. 648 (1962). Hence, an opposing party may not retreat to “the mere allegations or denials of his pleading” in face of “a motion for summary judgment made and supported as provided in ... [Rule 56].” Rule 56(e).
 

 Here, the detailed affidavits, extensive depositions and exhibits clearly disclose that the following relevant and material facts are not in dispute.
 

 On July 17, 1972, Potts mailed photographs, rules and a patent application description of “Wildcat” to Milton Bradley’s president, James Shea, with an accompanying letter inviting review by Shea or by Millens Taft, a senior vice president and director of research and development. The company does not deny that it received these materials; indeed, it acknowledges that they were routed to Shea’s secretary, who rerouted them to the Customer Service department for return to Potts. As will become clear, there is also no genuine issue that Shea did not see the submission.
 

 Equally well documented are the facts that by letter to Potts dated July 31, 1972,
 
 *1202
 
 defendant returned his enclosures, explaining in the form letter that the company was adhering to a formal policy of not considering unsolicited submissions such as plaintiff’s, and was returning the submission unexamined. Pursuant to this policy, adopted in 1969, defendant retained a copy of Potts’ letter and a copy of its reply.
 

 In the month after receiving defendant’s response, Potts wrote letters,
 
 sans
 
 submission, to other game companies urging them to review “Wildcat.” By September 1972 he had persuaded Parker Brothers (“Parker”), the other major game manufacturer, to accept “Wildcat” for examination. Parker was sent a working version of the game on September 12, 1972, which it kept until October 20. On that day Parker’s new product manager, Richard Barton, wrote to Potts that the company’s marketing people had showed “a degree of interest” in the game and had sent it to the costing department where, however, it became clear that the costs, of manufacture were too far above Parker’s desired figures to warrant further consideration. The game was returned.
 

 Working in Parker’s game development department at this time was one Robert Baron. Although he denied ever seeing Wildcat, Baron acknowledged that plaintiff’s game would have been available to him throughout the testing stages and cost analysis. On March 2,1973 Baron’s employment at Parker Brothers terminated.
 

 Previously, while still employed at Parker, he had done independent toy and game consulting work for the toy department at the Owens-Illinois Company. The head of that department was Robert Charlesworth. Another member was Jerrould Smith, Jr., a former Parker sales manager who had left in early 1972. All three terminated their relationship with Owens-Illinois in early 1973 and grouped together to create and sell toy and game ideas to the manufacturers.
 

 Among the ideas the group agreed should be worked on was one for an oil exploration game. Baron, the experienced game designer, was assigned responsibility for developing the game. The group then refined Baron’s version during the course of a week. This process occupied the first weeks of March 1973. Using contacts from his days at Parker, Smith then began the task of persuading a game company to look at the group’s game, which they called “Oil Baron,” and the three other ideas the group had devised. At Milton Bradley, the first contact, Smith was eventually put in touch with John O’Donnell, who was head of the marketing sales department.and a member of the company’s game selection committee. Smith persuaded O’Donnell that he could evaluate new game ideas, and that the idea of a game designer Milton Bradley did not know of, namely, Charlesworth, was worth examining. On that basis O’Donnell arranged for Smith and Charlesworth to speak to Richard Harris, one of Milton Bradley’s top game development people.
 

 Harris and Burke, a creative designer in the development department, met with Smith and Charlesworth on March 26, 1973. Charlesworth represented that he was “the sole and exclusive owner of [the] idea or suggestion,” in a document formally requesting the company to review Oil Baron and releasing it for that purpose, Dft. Exh. 2, p. 1, although a confidentiality agreement that apparently accompanied the release stated that Smith and Charlesworth together were the “sole owners.”
 
 Id.,
 
 p. 2. Also, a subsequent internal Milton Bradley form, Ptff. Exh. H, identified both Jerry Smith and Charlesworth as the “developer” of the game. And in fact, the three joint venturers considered themselves co-owners of the game, as they stated in their June 1973 agreement to divide any royalties from it. Ptff. Exh. K. It is undisputed, however, that no one ever mentioned Baron to Milton Bradley before it published King Oil.
 

 On the basis of the meeting with Charles-worth and Smith, defendant agreed to review Oil Baron further. The development department then refined the game in various respects, including the art work and rules, and changed the method of distributing the oil deposits throughout the game board’s interior. Also, the name was
 
 *1203
 
 changed to King Oil because research showed the name Oil Baron held little significance for children.
 

 At Milton Bradley a game selection committee supervised the progress of games in development, and evaluated and ultimately selected the games which the company would produce the following year. From the end of March 1973 on, this process included Oil Baron. The final decision to produce King Oil was reached in May 1973. The committee’s members included O’Donnell, president Shea, Taft, Vincent Martin, a company vice president, development department members Houlihan and Harris, and research director Dorothy Worcester.
 

 In January 1974 Milton Bradley entered into a licensing and royalty agreement with Charlesworth, in which he again represented, as he had when the game was first presented to the company, that he possessed all rights to it, as submitted. In February 1974 Milton Bradley published King Oil at the annual toy trade fair held in New York City. By this time Milton Bradley had incurred costs for tooling and other production components, for advertising and possibly some inventory.
 

 At the fair, Parker’s president, Randolph Barton, spoke to Shea about the suspicions people at Parker held that King Oil was “remarkably similar” to an oil exploration game that apparently had been worked on at Parker. Everett Morss of Parker wrote to Milton Bradley’s Millens Taft a follow-up letter on May 21, 1974, which specifically referred to an oil exploration game worked on by Baron. Ptff. Exh. R. Previously, president Barton had written Charlesworth that Parker believed that Charlesworth, whose name it had obtained from defendant, had caused Baron to divulge the “concept and design” of King Oil with which Baron assertedly had been involved while at Parker, in violation of Baron’s employment contract and confidential relationship with the company. Ptff. Exh. V. Parker’s attorneys also had written Baron expressing the company’s belief that Baron had been involved with the development, design and invention of King Oil while he was a Parker employee, and that any direct or indirect transfer of development information was in breach of his employment contract. Ptff. Exh. O.
 

 Potts learned of King Oil in March 1974 from a Chicago couple, Arthur Camire and his wife Nancy. Potts had come into contact with the Camires in September 1972 after he had written Cadaco, Inc., another game company, about submitting Wildcat. As Cadaco’s executive vice president Bonton wrote to Potts, the Camires had already developed a magnet-compass game involving “exactly the same concept” as Wildcat, although the game’s theme was prospecting for gold, not oil. See Dft. Exhs. 4, 5, 6. Art Camire apparently believed Cadaco was interested in producing a game like Wildcat or the gold prospecting game, and in late September 1972 he proposed a royalty sharing scheme to Potts. Cadaco then informed Potts at the end of October that the company could no longer add a new game to its line for presentation at the 1973 toy fair, and it returned the materials Potts had provided. Nevertheless, Potts and Camire entered into an agreement under which Ca-mire would act as Potts’ agent for negotiating to sell Potts’ game.
 

 Upon learning about King Oil from Mrs. Camire, Potts wrote her offering to share one-third of any settlement if she could contribute substantially to winning any infringement case. A patent for Wildcat was granted to Potts on April 2, 1974. It was not until July 20, 1974, however, that Potts’ attorneys wrote Milton Bradley concerning possible infringement.
 

 In the fifteen months following publication of King Oil at least six others, besides Potts and Parker, complained to Milton Bradley that King Oil was very much like games they had developed or seen. Including Potts, four of the complaints involved games known as Wildcat. Milton Bradley responded to all the inquiries, explaining essentially that a professional game designer had submitted King Oil’s prototype, and that the published game was unrelated to the game which had prompted the inquiry.
 

 
 *1204
 
 In July and again in November 1974 Charlesworth wrote to Milton Bradley and emphatically denied ever having heard of or seen Potts, Vantage, the patent or the other games. In June 1974 Charlesworth also responded directly to Parker’s inquiry. He denied that he “caused” Baron to divulge confidential information and affirmed that if such information had been disclosed in breach of any confidential relation Baron enjoyed with Parker, this had occurred without knowledge on his part. A year later, Charlesworth reaffirmed that Baron did not “submit” King Oil to him, and on this basis Parker closed its file on the matter. See Dft. Exhs. 16-19; Ptff. Exh. Y. In plaintiff’s view the foregoing facts present two essential claims for relief, both of which permit recovery and require trial. First, it contends that Milton Bradley developed King Oil by using the materials that Potts sent to Shea in July 1972. Second, it contends that when Baron left Parker in the beginning of 1973 and teamed up with Charlesworth and Smith from Owens-Illinois, he carried with him ideas he had drawn from plaintiff’s game while it was under review at Parker during his tenure. Assertedly, when Milton Bradley took on development of Oil Baron it knew or-should have known that the game was being disclosed to it in breach of a confiden-
 

 tial relation ultimately traceable to plainr tiff.
 
 [2]
 

 Without questioning the essential principle that ideas claimed proprietary may be protected against free use by others, outside the statutory ambits of patent and copyright, defendant challenges the legitimacy of most of the numerous, overlapping legal theories plaintiff has pleaded. It argues that the claim is properly viewed solely as one for misappropriation of property, sounding in tort, though it also questions the sufficiency of plaintiff’s theories in the context of this case. In addition, it contends that relief under almost all the theories is barred by the applicable statutes of limitations.
 

 But its primary contention is that the undisputed and established facts regarding the development of King Oil entitle it to judgment as a matter of law on both plaintiff’s claims. With respect to all of plaintiff’s many legal contentions arising from Potts’ direct submission to Shea, defendant claims it is entitled to judgment because there is no genuine issue that Wildcat was returned to Potts unexamined by anyone connected with developing King Oil, and that King Oil was independently developed from the Charlesworth submission without any knowing use of plaintiff’s materials.
 
 [3]
 
 With respect to plaintiff’s second
 
 *1205
 
 claim, defendant contends that there is no genuine issue that Baron did not misappropriate Potts’ submission to Parker, and that even if he did, Milton Bradley was without notice of the misappropriation until the 1974 toy fair when it had already changed its position by expending time and money in developing Oil Baron into the market-ready game King Oil. Accordingly, it is to these contentions that we turn first.
 

 Milton Bradley’s initial position is that plaintiff’s July 1972 submission was never examined by president Shea or anyone else connected with game development. Everyone connected with the development of Oil Baron has submitted affidavits in support of the present motion in which each of them denies ever having seen or heard of the Vantage submission prior to the litigation. The company asserts that it adhered to its policy of accepting for examination the “unsolicited” submissions of only “professional designers” and returning unexamined such submissions from individuals who were not recognized as or recommended by a professional in the game industry. It is undisputed that Potts was not a professional. Against this showing by defendant we conclude that plaintiff has failed to raise any genuine issue with respect to any material fact.
 

 In his affidavit president Shea described the operation and development of the submissions policy, a topic that was also the subject of deposition inquiry by plaintiff. In principle, any mail or package that could be identified as an unsolicited submission was supposed to be routed directly from the mail room or receiving department, to the customer service department without being shown to anyone in game development. Working from a list the company kept of approved designers, the customer service department was to send “professional” unsolicited submissions on to the development department, while non-professional submissions were to be returned unexamined by anyone in development. No record of returned submissions was kept except for copies of any covering correspondence and Milton Bradley’s form reply returning the submission.
 

 Milton Bradley’s ostensible reasons for limiting its review of unsolicited submissions to those of professional designers were, first, that such persons possessed the combined creative and business sense to know whether an idea could be successfully developed. The policy also would protect the company from litigation resulting from examination of the unsolicited submissions of countless “non-professionals,” and minimize conflicts with its own development department. On the other hand, plaintiff asserts without any support that the policy merely cloaked Milton Bradley’s true objective of obtaining game ideas without obligation to the submitters.
 

 Defendant acknowledges that because the cover letter was addressed to president Shea personally, the letter and enclosed submission were routed to the customer service department for return only after it reached Shea’s secretary. See Rule 9(g) Statement, ¶ 24. Plaintiff relies on the same circumstance, that the mail room sent the submission directly to Shea and not customer service, to contend that its submission was treated as a professional one from the outset. Concededly, “professional” submissions were copied and kept on file. Thus, if substantiated, the contention of “professional” treatment would permit a further inference of continued access notwithstanding the letter returning the. materials, which, conjoined with some demonstration of similarity, might warrant a conclusion of copying. Apart from that, plaintiff also contends, of course, that Shea and others saw the submission during the two weeks before it was returned, and retained its essential ideas.
 

 
 *1206
 
 First, there is no genuine issue that Milton Bradley did not treat plaintiff’s submission as a professional one. To support its assertion that the submission was so treated, plaintiff draws an inference from a portion of the deposition of James Houlihan, who was familiar with the company’s procedures for handling unsolicited submissions, including those addressed to individuals. He testified that individuals in the mail room determined if a submission was “professional.” But in relying on this statement, plaintiff ignores testimony in the same portion of the transcript (and in that of Richard Harris, another of the company’s top game reviewers) which indisputably establishes that submissions addressed to individuals at Milton Bradley, rather than simply to the company or one of its departments, routinely reached the addressees, who then determined from any covering material if the submission was a “professional” one. Furthermore, plaintiff’s extensive opportunity for discovery through Milton Bradley’s files has yielded no evidence that the company retained anything pertaining to plaintiff’s submission except copies of the covering letter and its own reply.
 

 In short, there is simply no factual support for plaintiff’s assertion that Milton Bradley had at hand pictures or other descriptive materials pertaining to Wildcat while it developed Oil Baron. As noted, the affidavits of the persons involved in developing King Oil, including Taft and Martin, are unanimous in denying all awareness of the existence of Wildcat during the relevant period, through Shea or otherwise. It is plain, however, that the sufficiency of these affidavits in eliminating any material issue of fact regarding Milton Bradley’s defense of non-use and independent development, rests on the sufficiency of president Shea’s affidavit. Conversely, the claim that Milton Bradley used game ideas from plaintiff’s submission reduces to the facts that the Potts letter and enclosed submission were addressed to Shea and reached his secretary’s desk.
 
 [4]
 

 Mindful that every reasonable inference must be drawn in favor of the party opposing summary judgment, the Court cannot say that by itself, Shea’s affidavit denial that he ever saw the Potts submission would suffice to dispel all factual dispute concerning his, and consequently Milton Bradley’s awareness of Wildcat and possible use of its ideas. Ordinarily, from the acknowledged fact that mail reached a secretary, it might be reasonable to infer that it continued on to the addressee for reading, and instructions as to its disposition. But Shea’s affidavit explains that the submission (though not specifically the letter), remained with his secretary and was not brought to his attention, precisely “in accordance” with the company’s policy of insulating persons involved in development, as he was, from exposure to nonprofessional, unsolicited submissions.
 

 Undoubtedly defendant’s showing on this point could be stronger. For example, Shea might have stated more explicitly that his secretary determined for him whether materials sent by mail were a professional submission or not, and whether correspondence separable from the submission itself was ever put before him, or the secretary might have provided a corroborating affidavit. But we think that the affidavit he submitted, based on his personal knowledge, sufficiently explained what happened to the submission to remove any issue that he ever examined it, and therefore obligated plaintiff to produce facts controverting this version in order to preclude summary judgment on the fundamental issues of access and independent development.
 
 Accord, Downey v. General Foods Corp.,
 
 31 N.Y.2d
 

 
 *1207
 
 56, 62, 334 N.Y.S.2d 874, 286 N.E.2d 257 (1972), where the New York Court of Appeals held that summary judgment was proper when pretrial discovery showed that plaintiff’s submission was kept “under lock and key” in files that no other department ever asked to research, by an individual who had no contact with the advertising agency that defendant claimed thought up the assertedly misappropriated name.
 

 Although, as plaintiff points out, this circuit may have embraced a “generous” view of corporate access, see,
 
 e.g., Bevan v. CBS,
 
 329 F.Supp. 601, 609-10 (S.D.N.Y.1971), the present case is readily distinguished from
 
 Bevan,
 
 and from
 
 Morrissey
 
 v.
 
 Proctor & Gamble Co.,
 
 379 F.2d 675 (1st Cir. 1967), on which the
 
 Bevan
 
 court relied. In
 
 Bevan,
 
 the court denied defendant’s motion for judgment
 
 n.o.v.
 
 on a claim for infringement of a common law copyright, holding that a jury could reasonably have found “access” to the plaintiff’s ideas from the mere fact that a presentation describing a proposed television series was mailed to CBS’s president. Unlike the present case, however, CBS’s letter responding to plaintiff’s submission expressed interest in the idea and did not indicate whether the submission was being returned or what had happened to it within CBS.
 

 In
 
 Morrissey,
 
 the court reversed a summary judgment the lower court had granted on the issue of non-access. Without detailing the kind of evidence the defendant had adduced to prove non-access, the court determined that a presumption of access, drawn from plaintiff’s mailing his idea to the company, remained in the case. The court also invoked the now discredited rule that summary judgment could not be granted where “there is the ‘slightest doubt as to the facts,’ ” 379 F.2d at 677, ignoring defendant’s apparent argument that summary judgment might be appropriate in light of the Second Circuit’s decision in
 
 Dressier v. MV Sandpiper,
 
 331 F.2d 130 (1964), which drew back from the restrictive summary judgment standard quoted by the First Circuit. 379 F.2d at 677. Here, by contrast, the undisputed facts establish defendant’s lack of access, a circumstance that plaintiff has wholly failed to rebut.
 

 There is no issue of fact regarding the lack of access to the Wildcat submission on the part of Taft and Vincent Martin, as set forth in their affidavits. Plaintiff has adduced nothing from which it might be reasonably inferred that Taft actually saw or considered or knew of the submission, except the possibility it was discussed or shown to him by Shea. But that contention has been foreclosed by the now undisputed fact that Shea never saw the submission.
 

 As for Martin, plaintiff points to the handwritten notations made on a copy of the Potts letter that Milton Bradley retained, Ptff. Exh. C. These notations read: “c/c Vincent Martin,” “Ps certified,” “large manila envelope” and give Potts’ name and address. Plaintiff argues that “c/c Vincent Martin” signifies that Martin received a copy of the entire submission. Yet Houlihan, who was familiar with the company’s procedures for handling unsolicited submissions that had been addressed to individuals, testified that the “c/c” notation was merely a direction to send Martin a copy of the Milton Bradley reply letter, which was done. See Ptff. Exh. G. Certainly, viewed in context with the other notations plainly referring to mailing directions, no reasonable inference can be drawn that the entire Wildcat submission was sent to Martin to review.
 

 In the circumstances, it is evident that plaintiff is opposing defendant’s motion for summary judgment with respect to the intertwined issues of access to plaintiff’s direct submission and the independent development of Oil Baron, entirely on the hope that a fact finder will disbelieve the persons who have submitted affidavits. This hope alone cannot defeat a properly supported motion for summary judgment. See
 
 Radix Organization, Inc. v. Mack Trucks, Inc.,
 
 602 F.2d 45, 48 (2d Cir. 1979). The opponent of the motion “must adduce factual material which raises a substantial question of the veracity or completeness of the movant’s showing or presents countervailing facts.”
 
 Beal v. Lindsay,
 
 468 F.2d
 
 *1208
 
 287, 291 (2d Cir. 1972). This plaintiff has not done, despite extended opportunity for discovery. See
 
 Dyer v. MacDougall,
 
 12 F.R.D. 357 (E.D.N.Y.1951),
 
 aff’d,
 
 201 F.2d 265 (Id Cir. 1952). “If the most that can be hoped for is the discrediting of defendants’ denials at trial no question of material fact is presented.”
 
 Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co.,
 
 513 F.2d 102, 110 (2d Cir. 1975).
 
 Accord, Downey v. General Foods Corp., supra,
 
 31 N.Y.2d at 62, 334 N.Y.S.2d 874, 286 N.E.2d 257.
 

 Turning next to plaintiff’s contention that Milton Bradley may be held liable through Baron’s alleged misappropriation of Wildcat while Parker Brothers was considering it, defendant argues first that there is no genuine issue that Baron did not misappropriate the submission. It points to Baron’s denial on deposition that he saw or heard of plaintiff’s submission while at Parker, and to his denial, corroborated by Smith and Charlesworth, that he passed along to the latter any information he had obtained at Parker. Baron Tr. 80, 81-82, 88-89, 92, 97; Charlesworth Tr. 38-39, 45, 65, 67-68; Smith Affidavit, ¶ ¶ 7, 8. Although Parker held suspicions about the true origin of King Oil — as, indeed, Parker’s vice-president Barton informed Milton Bradley’s president Shea as early as the 1974 toy fair — these supposedly were dispelled by Charlesworth’s continued, insistent denials which Parker ultimately accepted as a sufficient basis to close its file. Moreover, defendant urges, the suspicions were just that; apparently Barton could not identify any fact to substantiate the views others at Parker had expressed.
 

 Against this plaintiff has adduced sufficient circumstantial evidence to demonstrate that the question of Baron’s misappropriation is genuinely at issue. See
 
 Moore v. Ford Motor Co.,
 
 43 F.2d 685, 687 (2d Cir. 1930). Plaintiff’s submission was kept at Parker for testing and cost analysis. Baron acknowledged that before and after reaching those stages, games were available for his review and that he would have reviewed them also at the request of his superior, Parker’s vice-president for development. Baron Tr. 13-14, 16-17. Furthermore, the research and development department at this time was “pretty small.” Barton Tr. 9. Plaintiff also points to the Charlesworth group’s relatively rapid, two to three week development of Oil Baron and the three other ideas it submitted to Milton Bradley, and to the fact that neither Charlesworth nor Smith informed Milton Bradley they were working with Baron, or that he had worked for Parker. From these circumstances it might be permissible to infer that notwithstanding their protestations of innocence, Baron, Smith and Charlesworth (although perhaps only Baron knowingly), used plaintiff’s submission to Parker to develop Oil Baron. Although the nature and extent of Baron’s involvement in developing Oil Baron, and his access to plaintiff’s submission thus cannot be determined on summary judgment, trial of the issues is nonetheless unnecessary.
 

 Even if Baron misappropriated plaintiff’s submission, no liability attaches because Milton Bradley did not have notice of any misconduct by Baron, having dealt only with Charlesworth and Smith. Furthermore, by the time defendant arguably was put on notice about Charlesworth and Baron by Parker’s complaint at the toy fair, it had changed its position by investing time and money in making Oil Baron into the marketable game King Oil. Under the theory plaintiff has used to support its second claim for relief, this change in position precludes liability. See n.2,
 
 supra.
 

 Plaintiff does not seriously dispute that Milton Bradley was unaware of Baron or his purported role when it accepted Oil Baron for review. See Amend. Compl. ¶ 21. Plaintiff does contend, however, that the circumstances surrounding the submission to Milton Bradley were so “irregular” as to put defendant on notice that something was amiss. First, plaintiff asserts that the Charlesworth submission was accepted in violation of Milton Bradley’s own rules about submissions, since Charlesworth and Smith were not professional game designers. And it seeks to draw adverse inferenc
 
 *1209
 
 es from the gradual disappearance of Smith from Milton Bradley’s records concerning King Oil. Although Harris identified Smith as a principal after the initial March 26, 1973 meeting, Harris Tr. 46, Ptff. Exh. H, and the confidentiality agreement accompanying the initial release giving Milton Bradley two weeks to review the game stated that Charlesworth and Smith were the “sole owners” of Oil Baron, Dft. Exh. 2, p. 2, the release itself and the final license agreement were entered into only by Charlesworth, who warranted he was the game’s sole owner, Dft. Exhs. 1; 2, p. 1.
 

 In the context of the rule imposing liability for use of ideas known to have been divulged through breach of a duty owed by the discloser to another, these contentions do not raise any genuine issue regarding Milton Bradley’s knowledge about Baron, or, inferentially, about the possible source of Oil Baron. First, there is no genuine issue that acceptance of Oil Baron for initial review accorded with Milton Bradley policy governing submissions. President Shea stated in ¶ 3 of his affidavit that “[i]n addition” to the written policy defining “authorized” submissions, the company also accepted ideas “if recommended by a source that had the requisite background in the toy and game industry.” This is substantiated by Harris, who had initiated the policy and stated, in effect, that one purpose was to ensure a minimum of professionalism.
 

 Furthermore, plaintiff has not disputed defendant’s version of the events, that O’Donnell, who was head of Milton Bradley’s sales and marketing department, and a member of the game selection committee, was ultimately persuaded both that Smith, the former Parker salesman, possessed a professional ability to evaluate games and that Oil Baron deserved examination and that he thereupon requested Harris to review the game. This renders nugatory plaintiff’s contention that the only “professional” in the Charlesworth group was Baron and that therefore Milton Bradley must have inferred his presence. Nor can the Court logically accept the proposition that Milton Bradley’s knowledge that Smith once worked for Parker does anything to establish that Baron was involved as well, or that Milton Bradley should know about it. The simple fact is that Milton Bradley accepted Oil Baron for review because it was recommended by Smith, whom the company was willing to consider a professional.
 

 In short, the earliest that Milton Bradley can be charged with notice that Oil Baron might have a suspect origin was the first week of the toy fair, when Parker’s president Barton questioned Shea about King Oil in the belief that the game was one a Parker employee, not then named as Baron, had worked on while at Parker. See Barton Tr. 22. In fact, Baron is first named as King Oil’s originator only in the May 1974 letter from Parker’s Morss to Taft at Milton Bradley, which also acknowledged Milton Bradley’s help in providing Parker with Charlesworth’s address. While it might be inferred that Milton Bradley learned about Parker’s belief concerning Baron shortly before this letter, when Parker requested Charlesworth’s address, as a matter of law any notice it received in this period did not create liability under the trade secret analogy plaintiff has urged.
 

 By May 1974 Milton Bradley had already changed its position by incurring costs in bringing King Oil to market. Harris testified that if Milton Bradley had pulled King Oil off the market immediately after the toy fair, the company would have lost costs already incurred for tooling and other production components, for advertising and possibly some inventory. Harris Tr. 32-33. In these circumstances, “[t]he issue is whether the imposition of [a] duty” not to use the idea after notice of its improper disclosure, “would be inequitable under the circumstances.” Restatement, Torts, § 758, comment on clause (b), subsec. (e) at 22. The Court concludes that imposition of the duty plaintiff desires would be inequitable. It is plain that prior to receipt of notice, Milton Bradley “paid value for the secret or made other investments in connection with it.”
 
 Id.
 
 at 21. Thus, imposition of the duty “would subject [it] to loss” for actions taken when there was no such duty. See
 
 id.
 

 
 *1210
 
 In the interest of a complete disposition of the case • we now consider defendant’s alternate grounds for seeking a summary judgment. As will become clear, however, these do not eliminate all questions as to defendant’s liability.
 

 First, we cannot accept defendant’s argument that plaintiff is restricted in supporting its direct submission claim to a tort theory of misappropriation of the idea. On the contrary, the so-called law of ideas embraces numerous other grounds to afford protection to persons who, like plaintiff, have disclosed their ideas to others in the expectation that the idea would be used, and the use compensated.
 
 [5]
 
 And while the idea disclosure cases generally refer to the idea in suit as the plaintiff’s claimed “property,” the decisions have focused primarily on the relationship between the parties (or lack thereof) and not on any a
 
 priori
 
 recognition of exclusivity in the idea. See generally, 2 R. Milgrim, Trade Secrets, § 8.03 (1980); 3 M. Nimmer, Nimmer on Copyright, § 16 (1981); 1 Palmer, Law of Restitution, § 2.8 at 97-98,117-20; 3
 
 id.
 
 § 10.11.
 

 Beyond the threshold requirements that the idea be “novel” and “concrete,”
 
 [6]
 
 inquiry has focused on the circumstances under which the plaintiff’s ideas became known to the defendant. Thus, whether or not the idea is original or concrete, recovery may be permitted if there was an express promise to pay for its use. See,
 
 e.g., Krisel v. Duran,
 
 258 F.Supp. 845, 860 & n.59 (S.D. N.Y.1966) (cases under New York law). Absent an express agreement, the conduct' of the parties may indicate that use of the idea is governed by an agreement implied-in-fact. See,
 
 e.g., Desny v. Wilder,
 
 46 Cal.2d 715, 299 P.2d 257 (1956);
 
 American Mint Corp. v. Ex-Lax, Inc.,
 
 263 App.Div. 89, 31 N.Y.S.2d 708 (1st Dept. 1941);
 
 Anisgard v.
 
 Bray,-Mass.App.-, Mass.App.Adv. Sh., 419 N.E.2d 315 (1981). And there is support for the proposition that such an implied agreement may be based upon industry custom or usage regarding submission and use of ideas. See Sevan v.
 
 CBS, supra,
 
 329 F.Supp. at 608; 3 Nimmer,
 
 supra,
 
 § 16.05[B] at 16-33 & n.15.
 

 Even where the facts may not support an actual contractual relationship, the circumstances of the disclosure remain critical. Despite contrary intimations in earlier decisions,
 
 e.g., Bristol v. Equitable Life
 
 Assurance
 
 Co.,
 
 132 N.Y. 264, 30 N.E. 506 (1892), it is now accepted that recovery may be had wholly apart from contract where there has been “undue advantage through unfair conduct — a breach of confidence [or] reprehensible means of obtaining the valuable property rights of another without compensation.”
 
 Krisel v. Duran,
 
 303 F.Supp. 573, 578 (S.D.N.Y.1969). The restitutionary theories of unjust enrichment suggested in Judge Weinfeld’s summary phrasing received more explicit expression in
 
 Puente v. President & Fellows of Harvard College,
 
 248 F.2d 799, 802 (1st Cir. 1957):
 

 “An idea, as distinguished from the copyrighted contents of a book or a patented device or process, is accorded no protection in the law unless it is acquired and used under such circumstances that the law will imply a contractual or fiduciary relationship between the parties.”
 

 And quasi-contractual recovery in restitution was granted after termination of the
 
 *1211
 
 express contract in
 
 Hamilton National Bank v. Belt,
 
 210 F.2d 706 (D.C.Cir.1953),
 
 aff’g,
 
 108 F.Supp. 689 (D.D.C.1952), where the court explained that it was appropriate to include
 

 “an idea among protected property rights when it is definite and concrete, new and novel, has usefulness and is disclosed for commercial purposes in circumstances which the parties ought reasonably to construe as contemplating compensation for its use.” 210 F.2d at 709.
 

 Accord, Matarese v. Moore-McCormack Lines, Inc.,
 
 158 F.2d 631, 634 (2d Cir. 1946) (recovery for unjust enrichment in services rendered in submitting idea);
 
 Trenton Industries v. A. G. Peterson Mfg. Co.,
 
 165 F.Supp. 523, 532 (S.D.Cal.1958).
 

 To sustain recovery in quasi-contractual restitution it is unnecessary that the disclosure have been made in confidence, or that the parties be in a confidential relationship. See
 
 Trenton Industries v. A. G. Peterson, supra;
 
 2 Palmer,
 
 supra,
 
 § 10.11(d) at 474. On the other hand, the mere voluntary act of submitting an idea to one with whom the plaintiff has had no prior dealings will not make the disclosure one in confidence, even if stated to be so. A person may not “by his gratuitous and unilateral act, . .. impose upon another a confidential relationship.”
 
 Official Airlines Schedule Information Service v. Eastern Airlines, Inc.,
 
 333 F.2d 672, 674 (5th Cir. 1964).
 
 Accord, Bowen v. Yankee Network, Inc.,
 
 46 F.Supp. 62, 63 (D.Mass.1942) (distinguishing
 
 Moore v. Ford Motor Co., supra).
 
 Of course, if the parties agree that a disclosure is to be made in confidence, or some other confidential relationship obtains between the parties, use of the idea without compensation may provide the disclosure with an alternative remedy against the recipient for breach of confidence or the confidential relationship.
 

 Except for express contract plaintiff has relied on all these theories. It argues that Milton Bradley breached all the terms of a claimed implied-in-fact contract — which include a covenant of good faith and an alleged fiduciary relationship — by publishing King Oil at the annual toy fair in New York in February 1974 and paying royalties not to plaintiff, but to Charlesworth for his later submitted idea, and by concealing the Charlesworth submission from plaintiff and failing to investigate its charges of theft. On the same basis, plaintiff further contends that Milton Bradley had defrauded it by impliedly misrepresenting that it was willing to review plaintiff’s submission and would compensate plaintiff for use of its ideas, and by not disclosing that it did not so intend. It also argues that King Oil was a misappropriation of plaintiff’s game idea, giving rise to quasi-contractual restitutionary relief for unjust enrichment, as well as remedies for injury to property. In addition, plaintiff contends that the continued marketing of King Oil constitutes unfair competition in violation of common law and a false designation of origin prohibited by the Lanham Act, § 43(a), 15 U.S.C. § 1125(a).
 

 Attacking these theories
 
 seriatim,
 
 defendant first denies that a contract can be implied in fact when one party has expressly disavowed all intention to contract, as it purportedly did by returning plaintiff’s submission. See,
 
 e.g., N.Y. Central R. Co. v. Sturtevant & Haley Beef & Supply Co.,
 
 236 Mass. 16, 127 N.E. 509 (1920);
 
 Earle v. Coburn,
 
 130 Mass. 596 (1881).
 

 This position is unexceptionable insofar as the operative events are considered to be the defendant’s assent following plaintiff’s submission, which may be viewed as “the offer of an act for a promise.” 1 Corbin on Contracts, § 71. But the contention wholly ignores the fact that plaintiff’s argument for an implied-in-fact contract focuses on a different contractual sequence. Plaintiff claims that by submitting Wildcat to Milton Bradley, it accepted a continuing offer made by Milton Bradley to review unsolicited submissions from every source and pay for use of any ideas it used and hold them in confidence. Plaintiff’s basis for finding such an offer is an alleged game industry custom and usage. The general argument is advanced in 3 Nimmer,
 
 supra,
 
 § 16.05[B] at 16-33 as one with some support in the cases. In the present case, Milton Bradley’s decision to adopt and formalize its submissions procedures permits
 
 *1212
 
 an inference that such a custom existed. If so, the change in policy was ineffective as to plaintiff, since the company never undertook to revoke the offer outstanding on its part, for example, by public advertisement or announcement.
 
 Cf.
 
 1 Corbin,
 
 supra,
 
 § 41 (revocation of broadcast offer effective only by “equal” publication). In sum, the existence of such a custom, and Milton Bradley’s adherence to it, as well as the terms of any contract that might be implied, are issues of fact which would require resolution at trial.
 

 On the other hand, there seems to be no sound basis for implying the existence of a confidential relationship between plaintiff and Milton Bradley, either independently or as part of an implied-in-fact contract. While apparently some courts have grounded a confidential relationship on an inequality perceived to exist between idea submitters and recipients (usually those with the means to develop and market the idea), see 3 Nimmer,
 
 supra,
 
 § 16.06 at 16-46 — 16-47 & nn.12-14, imposition of such a relationship is unduly burdensome and unwarranted in policy where the sole contract between the parties has been the arms-length submission of an idea.
 

 It is true, as plaintiff argues, that a fiduciary relation is not required in order for a confidential relationship to be found, see Restatement of Trusts, 2d, § 2, comment c at 7. But here there is no preexisting relationship, for example, that of employer and employee, on which a fiduciary relation could be based, nor is there any indication that custom has established such a relationship in these circumstances. The Court perceives no equitable need in the relative positions of plaintiff and Milton Bradley to intervene on plaintiff’s behalf to the extent of imposing a fiduciary relationship where none would otherwise exist. Such a relationship imposes on the parties duties and remedial consequences far beyond those that either could reasonably expect. In fact, the quasi-contractual remedy for unjust enrichment previously discussed amply protects the economic interests involved in this type of situation.
 

 While it may be part of plaintiff’s claimed implied contract that Milton Bradley, as the idea recipient, undertook to hold it in confidence, the entire relationship was not thereby rendered “confidential” in the sense that the parties became subject to all the responsibilities and remedial consequences which equity attaches to such a relationship. The extent of the duty of one who has received an idea disclosed in confidence is not to disclose or use it adversely to the party making the disclosure. See Restatement of Torts, § 757, comment on clause (b) at 13.
 

 While defendant has argued that plaintiff’s claims are barred by. the running of the three-year Massachusetts statute of limitations applicable to actions to recover for injury to property, Mass.Gen. L.Ann. c. 260 § 2A, the Court is of opinion that only insofar as plaintiff’s claims sound in misappropriation are they barred. In deciding whether to apply the Massachusetts tort or contract limitations period the Court must determine “the essential nature of plaintiff’s claim.”
 
 Desmond v. Moffie,
 
 375 F.2d 742, 743 (1st Cir. 1967). See
 
 Kagan v. Levenson,
 
 334 Mass. 100, 134 N.E.2d 415 (1956). While direct authority is wanting, the Court does not doubt that a claim to recover for use of an unsolicited submission is primarily quasi-contractual in nature, and thus would be governed by the six-year limitations period applicable to “[ajctions of contract, other than those to recover for personal injuries, founded upon contracts or liabilities, express or implied.” Mass.Gen.L.Ann. c. 260, § 2. Certainly the Court is not concluded on the issue by plaintiff’s somewhat confused briefing. See Ptff.Br. at 46-48. Moreover, to the extent that plaintiff’s claims for an implied contract remain viable, they would be governed by this limitations period as well.
 

 Nevertheless, to the extent that recovery is sought for misappropriation of plaintiff’s idea, whether based on the direct or indirect submission theories, it is clear that any such claim is now time barred. Plaintiff did not commence its action against Milton Bradley until process was served on September 9, 1977, more than three years after the latest date on which its claim may be said to have accrued, the publication of King Oil at the toy fair in New York in February 1974.
 

 
 *1213
 
 Plaintiff, however, claims the benefit of the tolling provision of Mass.Gen.L. Ann. c. 260 § 12, which provides:
 

 “If a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action.”
 

 Plaintiff recognizes that the sole basis for its contention of fraudulent concealment is Milton Bradley’s alleged breach, by its silence, of the asserted fiduciary obligation to inform plaintiff about the Charlesworth submission, about Smith, and about Parker’s suspicions. Under Massachusetts law silence on the part of a fiduciary can toll the limitations period. See
 
 Jamesbury Corp. v. Worcester Valve Co.,
 
 443 F.2d 205 (1st Cir. 1971) (former employee), citing
 
 Stetson v. French,
 
 321 Mass. 195, 72 N.E.2d 410 (1947). But as previously discussed, here there was no confidential relationship between plaintiff and Milton Bradley, and the statute therefore ran untolled.
 

 As defendant points out with respect to the claim resting on the “indirect” submission through Baron, plaintiff has confused discovery of its injury with discovery of the cause of its injury. In fact, plaintiff knew of King Oil in March 1974, see Dft.Exh. 20, and its attorneys wrote Milton Bradley in July 1974 about possible patent infringement, Dft.Exh. 21. Plaintiff clearly had the means to know if its game ideas had been misappropriated. It knew that it had submitted Wildcat to defendant and to other game companies, and that it had been turned down by them all. Unlike
 
 Tracerlab, Inc. v. Industrial Nucleonics Corp.,
 
 313 F.2d 97 (1st Cir. 1963), which involved the “highly complex and entirely internal circuitry” of defendant’s competing radioactive measuring device, kept locked from plaintiff’s view, the embodiment of defendant’s alleged wrongdoing in the present case was obviously readily available to plaintiff on the shelf of any well-stocked toy and game department. Furthermore, while a claim grounded in fraud may not accrue until the fraud is discovered, plaintiff’s claim against Milton Bradley based on Baron’s alleged misappropriation is not one for fraud.
 

 Equally without merit is plaintiff’s contention that because its damages were assertedly “too speculative” in March or July 1974, its claims accrued “no earlier than the end of 1974.” Ptff.Br. at 49. The contention is based on the antitrust decision in
 
 Zenith Radio Corp. v. Hazeltine Research Inc.,
 
 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). While application of the doctrine outside the antitrust field is uncertain, we agree with Judge Sifton of this Court who dismissed a similar contention in an analogous context, observing that
 

 “[i]t can hardly be said that plaintiff lacked reasonable grounds to believe that he would not be able to prove the nature and extent of his future damages”
 

 if he had filed suit when the injury — publication of an allegedly misappropriated game — occurred.
 
 Thee v. Parker Bros.,
 
 Mem. at 10, No. 75 C 1554 (E.D.N.Y. March 9, 1978).
 

 Turning last to plaintiff’s claim that defendant’s marketing of King Oil violated the Lanham Act, § 43(a), and constitutes unfair competition, we cannot agree that the Act encompasses plaintiff’s claim. The statute is concerned with affirmative misrepresentations about the nature or source of the goods a defendant has sold or offered or advertised for sale. See,
 
 e.g., Fur Information & Fashion Council, Inc. v. E. F. Timme & Son, Inc.,
 
 501 F.2d 1048, 1051-52 (2d Cir.),
 
 cert. denied,
 
 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974);
 
 Alfred Dunhill, Ltd. v. Interstate Cigar Co.,
 
 499 F.2d 232 (2d Cir. 1974). Plaintiff has not pointed to any such misrepresentation, even assuming that defendant copied plaintiff’s ideas. Nor can the Court accept plaintiff’s attempt to emulate Procrustes and force its true injury, the alleged misappropriation of its ideas, into a claim for “reverse palming off” within § 43(a). There is simply no proof of any sort that defendant has ever used plaintiff’s prototype or finished game to represent anything about King Oil. See
 
 Commodore Import Corp. v. Hiraoka & Co., Ltd.,
 
 422 F.Supp.
 
 *1214
 
 628, 631 (S.D.N.Y.1976). For similar reasons plaintiff’s contentions based on State law of unfair competition must fail, too. See,
 
 e.g., Coca-Cola Co. v. Snow Crest Beverages, Inc.,
 
 64 F.Supp. 980 (D.Mass.1946),
 
 aff’d,
 
 162 F.2d 280 (1st Cir.),
 
 cert. denied,
 
 332 U.S. 809, 68 S.Ct. 110, 92 L.Ed, 386 (1947).
 

 In summary, the Court holds that defendant is entitled to judgment as a matter of law because there is no genuine triable issue of fact that defendant returned plaintiff’s Wildcat submission to plaintiff without it being examined by anyone connected with game development, and that it developed King Oil independently from plaintiff’s submission, entirely on the basis of the Charlesworth submission of Oil Baron and its own refinements, and because no liability may be predicated upon the alleged misappropriation through Baron.
 

 The parties will submit proposed forms of judgment within fifteen (15) days after receipt of a copy of this decision.
 

 SO ORDERED.
 

 [1]
 

 . The action as against the other defendants was discontinued.
 

 [2]
 

 . The parties have not questioned that analogously to the law governing trade secrets set forth in the Restatement of Torts, § 757(a), (c), liability may be imposed where the defendant was furnished the idea by a third party who learned of it from plaintiff in confidence or other fiduciary relationship, if the defendant knew of that relationship and that the disclosure was in breach thereof, at the time the third party furnished the idea. See
 
 Atlantic Wool Combing Co. v. Norfolk Mills, Inc.,
 
 357 F.2d 866 (1st Cir. 1966);
 
 New England Co. v. Pritchard,
 
 300 Mass. 362, 15 N.E.2d 440 (1938); Carter
 
 Products v. Colgate-Palmolive Co.,
 
 130 F.Supp. 557' (D.Md.1956),
 
 aff'd,
 
 230 F.2d 855 (4th Cir.),
 
 cert. denied,
 
 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59 (1956). On the other hand, where a party has learned of another’s idea or secret through a third party, without notice that the latter’s disclosure is in breach of a duty he owes to the other, the party is liable for its use only after notice that the disclosure was wrongful. And even then liability may not attach, if prior to receiving the idea, the recipient “has in good faith paid value for the secret or has so changed his position that to subject him to liability would be inequitable.” Restatement of Torts,
 
 supra,
 
 § 758; see
 
 Forest Laboratories, Inc. v. Pillsbury Co.,
 
 452 F.2d 621, 626-27 (7th Cir. 1971).
 

 [3]
 

 . The gist of the first claim in the present action is use of an idea that the plaintiff has disclosed to the defendant. Thus, however the claim for relief is framed, any inference of use, drawn, for example, from the facts of disclosure and similarity, very plainly may be rebutted by the defendant’s demonstration that it developed the claimed similar concept independently without reference to whatever material plaintiff submitted. See
 
 Larson v. General Motors Corp.,
 
 148 F.2d 319, 320 (2d Cir. 1945);
 
 O’Rourke v. RKO Radio Pictures,
 
 44 F.Supp. 480, 482 (D.Mass.1942);
 
 Roberts v. Dahl,
 
 6 Ill.App.3d 395, 402, 286 N.E.2d 51, 55;
 
 Downey
 
 v.
 
 General Foods Corp.,
 
 31 N.Y.2d 56, 334 N.Y. S.2d 874, 286 N.E.2d 257 (1972);
 
 Teich v. Gen
 
 
 *1205
 

 eral Mills, Inc.,
 
 170 Cal.App.2d 791, 339 P.2d 627, 634-36 (1959).
 

 The principle is one familiar in the fields of copyright, see,
 
 e.g.,
 
 3 Nimmer,
 
 supra,
 
 § 12.-11[D] at 12-83 — 12-86, and trade secrets, see,
 
 e.g.,
 
 2 Milgrim, Trade Secrets,
 
 supra,
 
 § 8.03[1] at 8-41.
 
 Cf. Kewanee Oil Co.
 
 v.
 
 Bicron Corp.,
 
 416 U.S. 470, 476, 490, 94 S.Ct. 1879, 1883, 1890, 40 L.Ed.2d 315 (1974) (“trade secret law does not forbid the discovery of the trade secret by fair and honest means,
 
 e.g.,
 
 independent creation or reverse engineering”).
 

 [4]
 

 . Plaintiff points also to the fact that the name “Wildcat” appeared on time sheets defendant kept for work done on Oil Baron. See Ptff. Exh. KK. At first blush, of course, the coincidence is noteworthy. Yet the Court must recognize that persons involved in developing a marketable game about oil exploration were likely to hit upon the term as particularly evocative of the rough and tumble aura many would associate (as indeed Potts did) with the hunt for crude. Accordingly, the appearance of “Wildcat” on Milton Bradley time sheets did not create a material issue of fact regarding its derivation. As previously noted, three persons besides plaintiff came up with the name “Wildcat” for an oil exploration game.
 

 [5]
 

 . Plaintiff has argued that some of its many theories of recovery are governed by New York law, and others by Massachusetts law, while defendant, with a narrower view of the action, has maintained that only Massachusetts law applies. Consideration of the available case law has persuaded the Court that in the main, the common law principles do not differ greatly between the two jurisdictions. The Court also notes that the parties have not confined themselves to the law of any particular jurisdiction, but have freely cited whatever authority upholds their particular arguments. Because there is some dearth of precedent under Massachusetts law, the Court has looked to other jurisdictions for support. See
 
 Depositors Trust Co. v. Hudson General Corp.,
 
 485 F.Supp. 1355, 1359 (E.D.N.Y.1980). Also, although the Massachusetts statutes of limitations have been applied with respect to defendant’s assertion of time bars to plaintiffs various claims, it does not appear that application of New York’s statutes would require a different result.
 

 [6]
 

 . See,
 
 e.g., Bailey v. Haberle-Congress Brewing Co.,
 
 193 Misc. 723, 85 N.Y.S.2d 51 (Mun.Ct. 1948). See generally, 3 Nimmer,
 
 supra,
 
 § 16.-08.